WRIGHT, L'ESTRANGE & ERGASTOLO
  Robert C. Wright (SBN 051864)
  rwright@wlelaw.com
402 West Broadway, Suite 1800
San Diego, CA  92101
(619) 231-4844
(619) 231-6710 (Facsimile)

Attorneys for Defendants Robert Joseph
Armijo and Joseph Financial, Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: 3:21-cv-01107-TWR-RBB |
| Plaintiff, | **ANSWER TO COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL** |
| v. | |
| ROBERT JOSEPH ARMIJO AND JOSEPH FINANCIAL, INC., | Complaint filed: June 14, 2021 |
| Defendants. | |

Defendants Joseph Financial, Inc. ("Joseph Financial") and Robert Joseph Armijo ("Armijo") (collectively, the "Defendants"), by and through their undersigned counsel, submit this Answer to Complaint for Injunctive and Other Relief and Demand for Jury Trial, and state as follows:

/ / /

/ / /

/ / /

1.     Defendants admit that Joseph Financial received approximately $1.1 million in connection with the purchase of EquiAlt-related investments and otherwise deny the allegations contained in this paragraph.

2.     Defendants admit that at all relevant times they were not registered as broker-dealers with the Commission or associated with a registered broker-dealer.  Defendants lack knowledge or information sufficient to form a belief about he truth of the allegations contained in the remainder of this paragraph and, therefore, deny these allegations.

3.     Defendants deny the allegations contained in this paragraph.

4.     Armijo was, at all relevant times, an insurance agent and California Investment Advisor Representative.  He had a Series 65 securities license.  He does not reside in La Mesa, California.  Armijo otherwise admits the allegations contained in this paragraph.

5.     Defendants deny that Joseph Financial was the alter ego of Armijo, and otherwise admit the allegations contained in this paragraph.

6.     Defendants admit the allegations contained in this paragraph.

7.     Defendants admit the allegations contained in this paragraph.

8.     Defendants admit the allegations contained in this paragraph.

9.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.

10.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.

11.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the first and second sentences of this paragraph relating to the creation of a Ponzi scheme and perpetuation of fraud.  Defendants allege that if such conduct occurred, it was without the

knowledge of Joseph Financial or Armijo.  Defendants otherwise admit the allegations contained in this paragraph.

12.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations. Defendants further allege that if the alleged material misrepresentations and omissions were made to investors in connection with the offer and sale of investments in EquiAlt funds, numerous similar material misrepresentations and omissions were made by EquiAlt to Joseph Financial and Armijo.

13.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph regarding alleged unknown "sales agents" or unknown EquiAlt investors, and, therefore, deny these allegations.  With respect to these answering Defendants, they admit that they participated in the sale of EquiAlt securities and signed a Selected Dealer Agreement with EquiAlt; and deny that many of the persons who purchased EquiAlt securities were elderly or unsophisticated.  Defendants deny that Armijo ever represented that EquiAlt investments were "secure, low-risk and conservative."

14.    Defendants deny ever making misrepresentations about the safety and security of investing in EquiAlt Funds.  Defendants admit that some investors were told by EquiAlt that 90% of their funds would be used to invest "in property."    Defendants further allege that if the alleged material misrepresentations and omissions were made by EquiAlt to investors in connection with the offering and sale of investments in EquiAlt Funds, numerous similar material misrepresentations and omissions by EquiAlt were made to Joseph Financial and Armijo.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and, therefore, deny these allegations.

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

15.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph with respect to other persons and, therefore, deny these allegations.  Joseph Financial admits that it received transaction-based compensation with BR Support Services, LLC.  Defendants also admit that EquiAlt, through its Vice-President, Barry Rybicki, and legal counsel, Paul Wassgren ("Wassgren"), advised Armijo that he was allowed to sell EquiAlt Funds without a Series 7 license or registration.

16.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.

17.     Defendants deny that compensation received in connection with EquiAlt sales was a "commission," deny that from 2013 to 2016 they were "sales agents" or acting as unregistered brokers, and lack information sufficient to form a belief about the truth of the allegations contained in this paragraph concerning whether the other California-based person was acting as an unregistered broker.  Defendants admit that Armijo's business relationship with the other person ended in early 2016.

18.     Defendants admit that Joseph Financial received transaction-based compensation from BR Support Services, LLC, in connection with the sale of EquiAlt Funds.  Defendants admit that Armijo and Rybicki orally agreed that Armijo would assist in the sale of EquiAlt Funds' securities and that Joseph Financial would receive between 6% and 10% in compensation from BR Support Services, LLC in connection with the sales.  The compensation was not a commission because it did not reduce the amount of the investment. Defendants further allege that all of the foregoing compensation was cleared by EquiAlt's legal counsel and an EquiAlt representative.  Defendants deny receiving bonuses in connection with sales.

19.    Defendants admit that between February 2016 through February 2020, Armijo occasionally participated in securities transactions involving EquiAlt Funds; communicated directly with and solicited some investors; that Armijo informed investors about the merits and substantial risk of investing in the Funds and EquiAlt's business model; and that Joseph Financial received transaction-based compensation.

20.    Defendants admit that Armijo discussed investing in EquiAlt Funds with potential investors and the risks of investing, as described by EquiAlt's legal counsel and an EquiAlt representative.  Armijo categorically denies ever describing the investments as low-risk and contends that to the extent EquiAlt investors have testified to such information in declarations, the testimony is false.  Defendants admit that Armijo described the material aspects of the investment to some investors; and that the facts were as represented by EquiAlt to Armijo, consistent with EquiAlt Private Placement Memoranda and other investment documents.  Defendants admit that they were not registered as brokers.  Armijo otherwise admits the allegations contained in the last sentence of this paragraph, and alleges that representations made to clients were consistent with EquiAlt Private Placement Memoranda and other investment documents.

21.    Defendants admit that Armijo assisted investors with paperwork, which is standard practice for an Investment Advisor Representative; denies that he participated in most aspects of securities sales transactions; and admits the allegations contained in the second and third sentences of this paragraph.  Defendants also admit that Armijo attempted to negotiate higher interest rates from EquiAlt on behalf of his clients to earn more money. Defendants deny raising about $4.85 million; admit that more than 50 investors participated in purchasing EquiAlt securities through these Defendants; and admit that Joseph Financial received approximately $1.1 million in transaction-

based compensation.  Defendants deny that the compensation was a "sales commission."

22.   Defendants admit that EquiAlt purportedly offered its securities under Rule 506(b) of Regulation D.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and, therefore, deny these allegations.

23.   Defendants deny that Joseph Financial participated in the sale of EquiAlt securities, except to the extent that it received transaction-based compensation.  Defendants admit that Armijo participated in the sale of EquiAlt securities; contend that Armijo had a Series 65 securities license; admit that they were not registered with the Commission as broker-dealers and were not associated with a registered broker-dealer; and allege that they never represented themselves as being broker-dealers or registered representatives of broker-dealers.

24.   Defendants repeat and reallege their responses to paragraphs 1 through 23 as if set forth fully at this point.

25.   Defendants admit that no registration statement was filed or in effect with respect to EquiAlt securities offered and sold and otherwise deny the remaining allegation in this paragraph.

26.   Defendants admit the allegations contained in this paragraph.

27.   This paragraph contains legal conclusions.  To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph, and, therefore, deny these allegations.  Armijo was informed by EquiAlt that EquiAlt securities qualified for exemption from registration under Regulation D. Defendants deny that an injunction is required to prevent further violations of securities laws.

28.   Defendants repeat and reallege their responses to paragraphs 1 through 23 as if set forth fully at this point.

29.   Defendants admit the allegations contained in this paragraph.

30.   This paragraph contains legal conclusions.   To the extent that a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and, therefore, deny these allegations.   EquiAlt and its legal counsel, Wassgren, represented to Armijo that his Series 65 license was sufficient, and a Series 7 license was unnecessary, to participate in the sale of EquiAlt securities. Defendants deny that an injunction is required to prevent further violations of securities laws.

## AFFIRMATIVE DEFENSES

Defendants assert the following Affirmative Defenses to the Complaint:

1.   The SEC has failed to state a claim against Defendants upon which relief may be granted.

2.   On information and belief, the SEC lacks standing to seek disgorgement against Defendants because the EquiAlt Receiver already has assets, including claims against EquiAlt's former legal counsel, Wassgren, sufficient to pay EquiAlt creditors and investors.

3.   Defendants did not knowingly or recklessly commit a violation of the securities laws and did not otherwise act with any requisite scienter.

4.   The SEC's claims are time-barred by the applicable five-year statute of limitations, as tolled by agreement between the parties.

5.   Investors' damages, if any, were caused by the acts of others, intervening, superseding or otherwise, including but not limited to the acts of EquiAlt and/or EquiAlt's principals, over whom Defendants have no control, and for whose acts Defendants are not legally answerable.

6.    The SEC is barred from obtaining disgorgement because the EquiAlt Receiver is pursuing the same recovery against these Defendants for the benefit of EquiAlt investors, and the SEC may not obtain double recovery.

7.    The SEC is barred from any recovery exceeding the net gain of these Defendants when both monies received and expenses are taken into account. *Liu v. Securities & Exchange Commission*, 140 S.Ct. 1936 (2020).

8.    Any recovery by the SEC against these Defendants must be offset against Defendants' losses caused by the fraudulent misrepresentations of EquiAlt as follows:

- On January 19, 2016, Armijo and Barry Rybicki ("Rybicki"), EquiAlt's Managing Director, had a lengthy telephone conversation about the possibility of Armijo becoming involved in the sale of EquiAlt Fund I debentures.  During the conversation that lasted over an hour, Armijo and Rybicki discussed numerous topics, including how the Fund worked, how Rybicki paid his advisors, and whether it was legal to pay advisors from the marketing account. Rybicki intentionally or negligently misrepresented to Armijo that he already had approval from EquiAlt's legal counsel to pay advisors from the marketing account, and that Armijo's licensing (Series 65 but not Series 7) was not an issue.  The Series 7 (registered representative) license was unnecessary.

- On November 21, 2017, after Armijo again raised the question with Rybicki in a text message of whether Armijo needed a Series 7 license to become involved in the sale of the EquiAlt REIT, which was then being introduced, Rybicki fraudulently or negligently mispresented to Armijo, in a November 21, 2017 text message, that he did not need a Series 7 license.  "Series 65 is good to go!"

A true and correct copy of this text exchange is attached as Exhibit A and incorporated by reference.

- On March 7, 2019, Rybicki again intentionally or negligently misrepresented to Armijo in a text message that his Series 65 license was "good." A true and correct copy of this text exchange is attached as Exhibit B and incorporated by reference.

- On or about July 5, 2017, Rybicki provided Armijo with contact information regarding EquiAlt attorney, Wassgren, so that Armijo could contact him. A true and correct copy of the contact information is attached as Exhibit C and incorporated by reference. On or about the same day, Armijo had a telephone conversation with Wassgren, during which time Armijo asked Wassgren whether he needed a Series 7 license to participate in the sale of EquiAlt securities. In the conversation, Wassgren intentionally or negligently misrepresented to Armijo that, if there was any problem with Armijo's licensing (Series 65), Wassgren would let Rybicki know, and Rybicki would tell Armijo. No such communication was later made to Armijo.

- On or about May 14, 2019, Armijo had another telephone call with Wassgren, with Rybicki's permission, and Wassgren intentionally or negligently misrepresented to Armijo on the telephone call that his Series 65 license was sufficient to be involved in the sale of EquiAlt REIT stock. A true and correct copy of a text exchange between Armijo and Rybicki wherein Rybicki gives Armijo permission to communicate with Wassgren regarding licensing is attached as Exhibit D and incorporated by reference.

- When making these misrepresentations, Rybicki and Wassgren intended that Armijo would rely upon them, which he reasonably

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

did in participating in the sale of EquiAlt securities without obtaining a Series 7 license.  The misrepresentations were false when made and were a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against Armijo and Joseph Financial Investment Advisors, LLC; investigation and pending litigation by the SEC against the Defendants in federal district court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims in this case; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters; and Armijo's decision to leave the financial advising industry.  Armijo has incurred attorneys' fees and financial damages as a result.  He has also sustained serious physical harm and pain and suffering, including heart problems and depression.

9.  Any recovery against these Defendants must be offset against the Defendants' losses caused by fraudulent concealment of material facts by EquiAlt and Rybicki as follows:

- On January 19, 2016, Armijo had a lengthy conversation with Rybicki about the possibility of Armijo becoming involved in the sale of EquiAlt debentures.  During that conversation, Rybicki discussed how EquiAlt Fund I worked, how Rybicki paid advisors from a marketing account, and that Rybicki had approval from EquiAlt's legal counsel (Wassgren) to pay advisors that way.  He also told Armijo that Armijo's licensing (Series 65 but not Series 7) was not an issue.  The Series 7 registered representative license was unnecessary.

- In the period between January 19, 2016, and February 2020, when a Receiver was appointed for EquiAlt, Armijo had numerous telephone and text message communications with Rybicki about EquiAlt business.

- The SEC and the Receiver contend that EquiAlt President, Brian Davison, and Rybicki conducted EquiAlt business as a classic Ponzi scheme; misappropriated investor funds to personal use; and misrepresented in private placement memoranda how investor funds would be used.

- If these facts are true, Rybicki failed to disclose to Armijo on January 19, 2016, and on multiple dates thereafter, in text messages and telephone conversations, that EquiAlt was being operated illegally, something that Defendants neither knew nor could reasonably have discovered.

- Rybicki concealed these facts with the intent to deceive Armijo. Had the omitted information been disclosed in January 2016, Armijo would never have become involved, or continue to be involved, in the sale of EquiAlt debentures or securities.

- The fraudulent concealment was a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against them; investigation and pending litigation by the SEC against the Defendants in federal district court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters, and Armijo's decision to leave the financial advising

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

industry.   Armijo has incurred attorneys' fees and financial damages as a result.   He has also sustained serious physical harm and pain and suffering, including heart problems and depression.

10.   Any recovery against the Defendants must be offset against Defendants' claims for losses caused by breach of contract as follows:

- On April 29, 2018, Armijo signed and sent to Rybicki a written contract with EquiAlt Secured Income Portfolio REIT, Inc.   The contract – the Selected Dealer Agreement – is attached as Exhibit E and incorporated by reference.

- Armijo has performed all the conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the agreement.

- If the results of the investigations made by the SEC and the Receiver of EquiAlt are accurate, EquiAlt breached the agreement in that the Section VII warranties about compliance of the Private Placement Memorandum with Regulation D were incorrect:   The Private Placement Memorandum for the REIT at least omitted material facts about the Ponzi scheme needed to make the facts stated not misleading.   The execution and delivery of the agreement violated the warranties that securities laws, rules, and regulations (including the requirement that Armijo have a Series 7 license) would be complied with and that the Private Placement Memorandum not contain inaccuracies.   EquiAlt also breached the agreement by failing to promptly correct inaccuracies in the Private Placement Memorandum.

- The breach of contract was a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

them; investigation and pending litigation by the SEC against the Defendants in federal district court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters, and Armijo's decision to leave the financial advising industry.  Armijo has incurred attorneys' fees and financial damages as a result.

- The Selected Dealer Agreement also provides in Section XI that EquiAlt will indemnify and hold harmless the Dealer from any and all losses to which the indemnified person may be subject.

- EquiAlt has thus far breached the agreement by failing to compensate Armijo for any of the losses caused by the materially false statements and material omissions in the Private Placement Memorandum for the REIT, including legal and other expenses reasonably incurred in investigating or defending against any loss.

11.   Any recovery against the Defendants must be offset against Defendants' claims for losses caused by EquiAlt's promissory fraud as follows:

- On April 29, 2018, Armijo signed and sent to Rybicki a written contract with EquiAlt Secured Income Portfolio REIT, Inc.  The contract – the Selected Dealer Agreement – has been previously attached as Exhibit E and incorporated by reference.

- Armijo has performed all the conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the Agreement.

- Section VII, paragraph 2, of the Selected Dealer Agreement represents and warrants to the Dealer in pertinent part as follows: "The Private Placement Memorandum . . . does not contain any

untrue statements of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. . . ."

- If the results of the investigations made by the SEC and the Receiver of EquiAlt are accurate, EquiAlt did not intend to perform this promise when EquiAlt made it.

- EquiAlt intended that Armijo rely on this promise, and he reasonably did so.

- If the results of the investigation made by the SEC and the Receiver of EquiAlt are accurate, EquiAlt breached this representation:  The Private Placement Memorandum for the REIT at least omitted material facts about the Ponzi scheme required to make the facts stated not misleading.

- Had the promissory fraud not occurred, Armijo would never have become involved, or continue to be involved, in the sale of EquiAlt debentures or REIT securities.

- The promissory fraud was a substantial factor in causing persons purchasing EquiAlt securities through Armijo to bring a class action for securities fraud (now subject to a tolling agreement) against Armijo and Joseph Financial Investment Advisors, LLC; investigation and pending litigation by the SEC against the Defendants in federal court, San Diego, California, including a request for civil penalties and disgorgement; the Receiver's claims; the destruction of Armijo's reputation among his clients in the insurance and financial advising industry; the incurring of significant attorneys' fees to respond to the foregoing matters, and Armijo's decision to leave the financial advising industry.   Armijo has

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

incurred attorneys' fees and financial damages as a result.  He has also sustained serious physical harm and pain and suffering, including heart problems and depression.

12. Any recovery against these Defendants must be offset against the Defendants' losses caused by EquiAlt, through its agents Rybicki and Wassgren, under the theory of tort of another, as follows:

- EquiAlt, through its agents Rybicki and Wassgren, have engaged in tortious conduct, and breach of contract, as described in paragraphs 8 through 11 above, incorporated by reference, including: (1) fraudulent misrepresentations (Affirmative Defense No. 8); (2) fraudulent concealment (Affirmative Defense No. 9); (3) breach of contract (Affirmative Defense No. 10); and (4) promissory fraud (Affirmative Defense No. 11).

- EquiAlt's tortious conduct and breach of contract have forced Defendants to incur the expense of defending this action and defending against the actions filed against Defendants by harmed investors and the SEC.

- Under third party tort of another theory, as discussed and set forth in *Prentice v. N. Am. Title Guar. Corp.*, 59 Cal.2d 618, 620 (1963), "[a] person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorneys' fees, and other expenditures thereby suffered or incurred."

- As a direct, proximate and foreseeable result of the tortious conduct and breach of contract by EquiAlt, as alleged here, Defendants have been damaged in that they have lost time and

incurred attorneys' fees and costs in an amount according to proof at trial.

13.    No injunction is required to prevent future securities laws violations because (i) the alleged violations by the Defendants are technical in nature, based on the advice of legal counsel and (ii) Defendants are also intending to leave the securities industry.

14.    No civil penalties should be imposed on the Defendants because their violations, if any, were (i) technical in nature, based on the advice of legal counsel; (ii) EquiAlt's fraud against these Defendants has already caused substantial financial harm; and (iii) the Defendants have fully cooperated with the SEC and the EquiAlt Receiver in their investigations.

15.    Defendants reserve all other defenses (whether procedural, substantive, or otherwise), limitations, and specific provisions of the Federal Rules of Civil Procedure, which may prove applicable to the facts of the matter as disclosed through the discovery process or otherwise.

WHEREFORE, Defendants request that judgment be entered in their favor and against the plaintiff, that they recover their costs of suit incurred, and that they obtain all of the proper relief.

WRIGHT, L'ESTRANGE & ERGASTOLO
Attorneys for Defendants Robert Joseph Armijo and Joseph Financial, Inc.

Dated: September 3, 2021      By:   /s/ Robert C. Wright
                              Robert C. Wright
                              rwright@wlelaw.com

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

## DEMAND FOR JURY TRIAL

Defendants demand a trial by jury of all issues so triable.

Date:  September 3, 2021          Respectfully submitted,

/s/ Robert C. Wright_____
Robert C. Wright
Cal. Bar No.:  051864
Wright, L'Estrange & Ergastolo
402 West Broadway, Suite 1800
San Diego, California 92101
T:  (619) 231-4844
F:  (619) 231-6710
E:  rwright@wlelaw.com
*Lead Counsel for Defendants*
*Joseph Financial, Inc.*
*and Robert Joseph Armijo*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 3, 2021, the foregoing document was filed using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Robert C. Wright_____
Robert C. Wright

**ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

*Securities and Exchange Commission v. Robert Joseph Armijo and Joseph Financial, Inc.*

United States District Court, Southern District of California
Case No. 3:21-cv-01107-TWR-RBB

**TABLE OF CONTENTS OF EXHIBITS**

**EXHIBITS ATTACHED TO ANSWER TO COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL:**

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | 11/19/2017 Text exchange between Barry Rybicki and Robert Armijo re Armijo inquiring of EquiAlt counsel whether his Series 65 license was sufficient. | 1 |
| B | 03/07/2019 Text exchange between Barry Rybicki and Robert Armijo re Rybicki telling Armijo that counsel for EquiAlt (Wassgren) said the Series 65 license is good. | 3 |
| C | Barry Rybicki e-mail to Robert Armijo with contact information for EquiAlt's counsel, Paul Wassgren. | 4 |
| D | 05/14/2019 text exchange between Barry Rybicki and Robert Armijo re Armijo inquiring if it was okay if Armijo could call Paul Wassgren regarding his licensing. | 5 |
| E | April 29, 2018 EquiAlt Secured Income Portfolio REIT, Inc. -- Selected Dealer Agreement signed by Robert Armijo | 6 |

# EXHIBIT A



different address for him?

Nov 21, 2017, 6:16 AM

Thanks! Sorry I forgot to respond. I was in mid appt and blanked out after

Seddigh funds available as of today per vantage

Nov 21, 2017, 7:26 AM

No worries and I will get the paperwork to them. Thx

Nov 21, 2017, 9:38 AM

Thank you

Nov 21, 2017, 4:08 PM

Series 65 is good to go!



# EXHIBIT B

I have an email out. Will let you
know as soon as I can

Thank you

You know this

Mar 7, 2019, 12:53 PM

Call me when you can. Thanks

We're good. He said it's general
inquiry and the 65 is good

Mar 8, 2019, 1:44 PM

Sending in new client
paperwork for $25k

REIT

Mar 8, 2019, 2:49 PM

Sounds great, thank you!

# EXHIBIT C

**From:** Barry Rybicki <barry@equialt.com>
**Subject: Our attorney**
**Date:** July 5, 2017 at 2:23:19 PM PDT
**To:** Bobby Armijo <bobby@josephfinancialinc.com>

**Paul R. Wassgren**
Partner
P + 1 310 595 3035
M + 1 617 461 4061
F +1 310.595.3335
E paul.wassgren@dlapiper.com



DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
United States
www.dlapiper.com

Cordially,



1

# EXHIBIT D

< 

Barry >

Nothing yet. I will follow up this upcoming week

Ok thanks. Have a good weekend

Thanks and you too

May 14, 2019, 10:32 AM

Oh I meant to ask if I can call your attorney again regarding my licensing etc. Just so I can hear it again

Paul at DLA piper

Sure

Thank you



May 16, 2019, 11:49 AM



# EXHIBIT E

EQUIALT SECURED INCOME PORTFOLIO REIT, INC.

Up to $100,000,000 of Class A Shares of Common Stock
Offered to accredited investors only

SELECTED DEALER AGREEMENT

Ladies and Gentlemen:

EquiAlt Secured Income Portfolio REIT, Inc. (the "**Company**"), a Maryland corporation, invites you (the "**Dealer**") to participate in the distribution of Class A shares of common stock (the "**Shares**") of the Company (the "**Offering**") subject to the following terms.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Company's Confidential Private Placement Memorandum dated December 7, 2017, as it may be amended or supplemented from time to time (the "**Private Placement Memorandum**").

**I.**     **Appointment and Obligations of the Dealer**

On the basis of the representations, warranties and covenants herein contained, but subject to the terms and conditions herein set forth, the Dealer is hereby appointed to sell the Shares on a "best efforts" basis through a private, limited offering exempt from registration pursuant to: (i) Rule 506(b) of Regulation D ("**Rule 506**") promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"); and (ii) applicable state blue sky exemptions.

The Dealer hereby agrees to use its best efforts to sell the Shares for cash on the terms and conditions stated herein and in the Company's Private Placement Memorandum.

The Dealer shall have no authority to appoint any person or other entity as an agent or sub-agent of the Dealer or the Company.  The Dealer acknowledges and agrees that the Company may (a) enter into agreements with other broker-dealers and registered investment advisors (collectively with Dealer, the "**Dealers**") for the offer and sale of Shares in the Offering and (b) sell Shares directly as an issuer-dealer.

**II.**     **Submission of Orders**

In order to purchase Shares in the Offering, the subscriber must complete and execute a subscription agreement substantially in the form included as an appendix to the Private Placement Memorandum (a "**Subscription Agreement**") together with a check or wire transfer ("**instruments of payment**") in the amount of such person's purchase as described below.  Those persons who purchase Shares will be instructed by the Dealer to make their instruments of payment payable to or for the benefit of "UMB Bank, N.A.,  as escrow agent for EquiAlt Secured Income Portfolio REIT, Inc." or, after the Company has raised gross proceeds of

$2,000,000 from the sale of its common stock whether in this Offering or in a separate private transaction outside of this Offering, including from persons who are affiliated with the Company, its sponsor or its advisor (the "**Minimum Offering**"), to the Company, except with respect to Benefit Plan investors. Instruments of payment from Benefit Plan investors must be made payable to or for the benefit of "UMB Bank, N.A., as escrow agent for EquiAlt Secured Income Portfolio REIT, Inc." until the Company determines that it is no longer necessary to limit participation by Benefit Plan investors as described in the Private Placement Memorandum (the "**Benefit Plan Determination**"). The Dealer will return any instrument of payment it receives not conforming to the foregoing instructions directly to such subscriber not later than the end of the next business day following its receipt. Instruments of payment received by the Dealer that conform to the foregoing instructions shall be transmitted for deposit pursuant to one of the following methods:

Where, pursuant to the Dealer's internal supervisory procedures, internal supervisory review is conducted at the same location at which subscription documents and instruments of payment are received from subscribers, instruments of payment will be transmitted by the end of the next business day following receipt by the Dealer for deposit to the escrow agent for the Company or, after the Minimum Offering has been achieved, to the Company or its agent, except for investments from Benefit Plan investors. The Dealer will transmit instruments of payment from Benefit Plan investors for deposit to the escrow agent for the Company or, after the Benefit Plan Determination has been made, to the Company or its agent.

Where, pursuant to the Dealer's internal supervisory procedures, final internal supervisory review is conducted at a different location, instruments of payment will be transmitted by the end of the next business day following receipt by the Dealer to the office of the Dealer conducting such final internal supervisory review (the "**Final Review Office**"). The Final Review Office will in turn by the end of the next business day following receipt by the Final Review Office transmit such instruments of payment for deposit to the escrow agent for the Company or, after the Minimum Offering has been achieved, to the Company or its agent, except for investments from Benefit Plan investors. The Final Review Office will transmit instruments of payment from Benefit Plan investors for deposit to the escrow agent for the Company or, after the Benefit Plan Determination has been made, to the Company or its agent.

## III.     Pricing

The Shares will be offered at the offering prices and upon the terms and conditions set forth in the Private Placement Memorandum (as amended and supplemented).

## IV.     Dealer's Compensation

Except for any discounts described in or as otherwise provided in the "Plan of Distribution" section of the Private Placement Memorandum (as amended and supplemented) and subject to the conditions below, in consideration of the Dealer's services hereunder, the

**EXHIBIT E, PAGE 7**

selling commissions and marketing allowances payable to the Dealer by the Company are as follows:

4.1     The Dealer will receive selling commissions of 6.5% of the purchase price of the Shares sold by the Dealer in the Offering; provided, however, that this amount will be reduced to the extent a lower commission rate is agreed upon in writing between the Company and the Dealer (the above being referred to as the "**Commissions**").

4.2     The Dealer will receive a non-accountable marketing and due diligence allowance of 1.0% of the purchase price of the Shares sold by the Dealer in the Offering; provided, however, that this amount will be reduced to the extent a lower allowance rate is agreed upon in writing between the Company and the Dealer (the "**Allowances**").

All Commissions and Allowances shall be based on Shares sold by Dealer and accepted and confirmed by the Company, which Commission and Allowance will be paid by the Company.  For these purposes, a "sale of Shares" shall occur if and only if a transaction has closed with a subscriber for Shares pursuant to all applicable offering and subscription documents, payment for the Shares has been received by the Company in full in the manner provided in Section II hereof, the Company has accepted the Subscription Agreement of such subscriber, the Minimum Offering has been achieved and, with respect to Benefit Plan investors, subscription funds have been released to the Company from escrow as described in the Private Placement Memorandum.

The parties hereby agree that the foregoing Commissions and Allowances are not in excess of the usual and customary distributors' or sellers' commission received in the sale of securities similar to the Shares, that Dealer's interest in the offering is limited to such Commission and any Allowance from the Company and Dealer's indemnity referred to in Section XI of this Agreement.

4.3     The Company will pay or reimburse bona fide invoiced due diligence expenses of Dealer, and may, in its discretion, pay or reimburse for additional items of underwriting compensation referenced in the Private Placement Memorandum to the extent the Private Placement Memorandum indicates that they may be paid by the Company.  All other expenses incurred by you in the performance of your obligations hereunder, including but not limited to expenses related to the Offering and any attorneys' fees, shall be at your sole cost and expense, and the foregoing shall apply notwithstanding the fact that the Offering is not consummated for any reason.

## V.     Payment

Payment of Commissions or Allowances will be made by the Company to the Dealer within 30 days of the receipt by the Company of the gross proceeds of the applicable sale of Shares by the Dealer.

## VI.     Right to Reject Orders or Cancel Sales

All orders, whether initial or additional, are subject to acceptance by and shall only become effective upon confirmation by the Company. The Dealer agrees that the Company, in its sole and absolute discretion, may accept or reject any subscription, in whole or in part, for any reason whatsoever, and no Commission or Allowance will be paid to the Dealer with respect to the portion of any subscription that is rejected. Orders not accompanied by a Subscription Agreement with the signature page and the required instrument of payment in payment for the Shares may be rejected. Issuance and delivery of the Shares will be made only after actual receipt of payment therefor. If any instrument of payment is not paid upon presentment, or if the Company is not in actual receipt of clearinghouse funds or cash, certified or cashier's check or the equivalent in payment for the Shares, the Company reserves the right to cancel the sale without notice. In the event an order is rejected, canceled or rescinded for any reason, the Dealer agrees to return to the Company any Commission or Allowance theretofore paid with respect to such order within 30 days thereafter and, failing to do so, the Company shall have the right to offset amounts owed against future Commissions or Allowances due and otherwise payable to the Dealer.

### VII. Representations, Covenants and Agreements of the Company

As an inducement to the Dealer to enter into this Agreement, the Company represents and warrants to the Dealer that:

1.      The Company has been duly and validly organized and formed as a corporation under the laws of the State of Maryland, with the power and authority to conduct its business as described in the Private Placement Memorandum.

2.      The Private Placement Memorandum with respect to the Offering has been prepared by the Company. The Private Placement Memorandum complies with the Securities Act for offerings solely to accredited investors pursuant to Rule 506(b) of Regulation D promulgated thereunder and does not contain any untrue statements of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading; provided, however, that the foregoing provisions of this Section 7.2 will not extend to such statements contained in or omitted from the Private Placement Memorandum that are primarily within the knowledge of any of the Dealers. Copies of the Private Placement Memorandum and each amendment and supplement thereto have been or will be delivered to the Dealer.

3.      The Company intends to use the funds received from the sale of the Shares as set forth in the Private Placement Memorandum.

4.      The Company has full legal right, power and authority to enter into this Agreement and to perform the transactions contemplated hereby, except to the extent that the

enforceability of the indemnity provisions contained in Section XI of this Agreement may be limited under applicable securities laws and to the extent that the enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws that affect creditors' rights generally or by equitable principles relating to the availability of remedies.

5.      The execution and delivery of this Agreement, the consummation of the transactions contemplated herein and compliance with the terms of this Agreement by the Company will not conflict with or constitute a default or violation under any charter, bylaw, contract, indenture, mortgage, deed of trust, lease, rule, regulation, writ, injunction or decree of any government, governmental instrumentality or court, domestic or foreign, having jurisdiction over the Company, except to the extent that the enforceability of the indemnity provisions contained in Section XI of this Agreement may be limited under applicable securities laws and to the extent that the enforceability of this Agreement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws that affect creditors' rights generally or by equitable principles relating to the availability of remedies.

6.      No consent, approval, authorization or other order of any governmental authority is required in connection with the execution or delivery by the Company of this Agreement or the issuance and sale by the Company of the Shares, except as may be required under the Securities Act and the rules and regulations (the "**Rules and Regulations**") of the Securities and Exchange Commission ("**SEC**") promulgated thereunder or under applicable state securities laws.

7.      The Shares have been duly authorized and, when issued and sold as contemplated by the Private Placement Memorandum and upon payment therefor as provided in the Private Placement Memorandum and this Agreement, the Shares will be validly issued, fully paid and nonassessable and will conform to the description thereof contained in the Private Placement Memorandum.

8.      The Company will, at no expense to the Dealer, furnish the Dealer with such number of printed copies of the Private Placement Memorandum, including all amendments, supplements and exhibits thereto, as the Dealer may reasonably request. It will similarly furnish to the Dealer as many copies of Authorized Sales Materials (as defined in Section IX below) as the Dealer may reasonably request in connection with the Offering.

9.      If at any time during the Offering any event occurs as a result of which, in the opinion of the Company, the Private Placement Memorandum would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in view of the circumstances under which they were made, not misleading, the Company will notify the Dealer thereof (unless the information shall have been received from the Dealer) and will effect the preparation of an amended or

WEST\278929533.2                                 5

supplemental Private Placement Memorandum that will correct such statement or omission.

10.     None of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the Offering, any beneficial owner (as that term is defined under Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")) of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the Securities Act) connected with the Company in any capacity at the time of sale (each, a "**Company Covered Person**" and, together, "**Company Covered Persons**") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (a "**Disqualification Event**"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) under the Securities Act. The Company has exercised, and during the term of the Offering will continue to exercise, reasonable care to determine whether any Company Covered Person, any Dealer Covered Person (as defined in Section 8.9 below) is subject to a Disqualification Event.  The Company will immediately comply, to the extent applicable, with its disclosure obligations under Rule 506(e), and will immediately effect the preparation of an amended or supplemental Private Placement Memorandum that will contain any such required disclosure and will, at no expense to the Dealer, promptly furnish the Dealer with such number of printed copies of such amended or supplemented Private Placement Memorandum containing any such required disclosure, including any exhibits thereto, as the Dealer may reasonably request.

11.     The Company is not aware of any person (other than any Company Covered Person or Dealer Covered Person) that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of any Shares.

12.     With respect to each Company Covered Person, the Company has established procedures reasonably designed to ensure that the Company receives notice from each such Company Covered Person of (i) any Disqualification Event relating to that Company Covered Person, and (ii) any event that would, with the passage of time, become a Disqualification Event relating to that Company Covered Person.

13.     The representations and warranties in Sections 7.10 through 7.12 are and shall be continuing representations and warranties throughout the term of the Offering. The Company will promptly notify the Dealer in writing upon becoming aware of any fact which makes any such representation or warranty untrue.

## VIII.   Covenants and Agreements of the Dealer

Dealer covenants and agrees with the Company that:

1.     Dealer will use its best efforts to sell the Shares for cash on the terms and conditions set forth in this Agreement and the Private Placement Memorandum.

2.     In connection with the Dealer's participation in the offer and sale of Shares (including, without limitation, all initial and additional subscriptions for Shares and any resales and transfers of Shares), the Dealer will comply with all requirements and obligations imposed upon it by (a) the Securities Act, the Exchange Act, and the Rules and Regulations of the SEC promulgated under both such acts; (b) all applicable state securities laws and regulations as from time to time in effect; (c) the applicable rules of the Financial Industry Regulatory Authority, Inc. ("**FINRA**"), including, but not in any way limited to, FINRA Rule 2040, FINRA Rule 2121 and FINRA Rule 5141; (d) all applicable rules and regulations relating to the suitability of investors; (e) any other state and federal laws and regulations applicable to the Offering, the sale of Shares or the activities of the Dealer pursuant to this Agreement, including without limitation the privacy standards and requirements of state and federal laws, including the Gramm-Leach-Bliley Act of 1999, and the laws governing money laundering abatement and anti-terrorist financing efforts, including the applicable rules of the SEC and FINRA, the Bank Secrecy Act, as amended, the USA Patriot Act of 2001, and regulations administered by the Office of Foreign Asset Control at the Department of the Treasury; and (f) this Agreement and the Private Placement Memorandum as amended and supplemented.

3.     The Dealer will not offer Shares in any jurisdiction unless and until (a) the Dealer has been advised in writing by the Company that the Shares are exempt from the securities laws of such jurisdiction and (b) the Dealer has all required licenses and registrations to offer shares in that jurisdiction.

4.     The Dealer will offer Shares (both at the time of an initial subscription and at the time of any additional subscription) only to persons who meet the financial qualifications and suitability standards set forth in the Private Placement Memorandum as amended or supplemented or in any suitability letter or memorandum sent to the Dealer by the Company.  In offering Shares, the Dealer will comply with the provisions of all applicable rules and regulations relating to suitability of investors, including without limitation, the provisions of Regulation D, Rule 506 promulgated under the Securities Act and FINRA Rule 2111.

**EXHIBIT E, PAGE 12**

5.      The Dealer agrees to maintain a record of the information obtained to determine that an investor meets the financial qualification and suitability standards imposed on the offer and sale of the Shares (both at the time of the initial subscription and at the time of any additional subscriptions) (the "**Suitability Records**"), for a period of six years from the date of the sale of the Shares. The Dealer further agrees to make the Suitability Records available to the Company upon request and to make them available to representatives of the SEC and FINRA and applicable state securities administrators upon the Dealer's receipt of a subpoena or other appropriate document request from such agency.

6.      If requested by the Company, the Dealer shall obtain from subscribers for the Shares, other documentation reasonably deemed by the Company to be required under applicable law or as may be necessary to reflect the policies of the Company. Such documentation may include, without limitation, subscribers' written acknowledgement and agreement to the privacy policies of the Company.

7.      The Dealer will provide the Company with such information relating to the offer and sale of the Shares by it as the Company may from time to time reasonably request or as may be requested to enable the Company, as the case may be, to prepare such reports of sale as may be required to be filed under applicable federal or state securities laws and the rules and regulations thereunder.

8.      Further, the Dealer specifically agrees as set forth below:

(a)  Shares shall not be offered and/or sold by the Dealer by means of any form of general solicitation or general advertising, including, but not limited to, the following:

        (1)     any advertisement, article, notice, or other communication published in any newspaper, magazine or similar media, cold mass mailings, broadcasts over television or radio, material contained on a website available to the public or an e-mail message sent to a large number of previously unknown persons;

        (2)     any seminar or meeting whose attendees have been invited by any general solicitation or general advertising; or

        (3)     any letter, circular, notice, or other written communication constituting a form of general solicitation or general advertising.

(b)  In connection with any offer or sale of the Shares, the Dealer agrees to the following:

        (1)     to comply in all respects with statements set forth in the Private Placement Memorandum and any supplements or amendments to the Private Placement Memorandum;

      (2)    not to make any statement inconsistent with the statements in the Private Placement Memorandum and any supplements or amendments to the Private Placement Memorandum;

      (3)    not to make any untrue or misleading statements of a material fact in connection with the Shares; and

      (4)    not to provide any written information, statements, or sales materials other than the Private Placement Memorandum and any supplements or amendments thereto and any supplemental information, unless approved in writing by the Company.

(c) The Dealer:

      (1)    acknowledges that any Registration Statement on Form S-11 or any draft registration statement submitted confidentially to the SEC pursuant to Section 6(e) of the Securities Act for an initial public offering of the shares of common stock of the Company (the **"Registration Statement"**) relates only to the initial public offering of shares of common stock of the Company and not to this Offering;

      (2)    agrees that it will not utilize the Registration Statement or the prospectus that forms a part thereof in connection with the marketing of this Offering; and

      (3)    agrees that it will not offer or sell Shares in this Offering to any person who contacts the Dealer as a result of reviewing or receiving the Registration Statement or the prospectus that forms a part thereof.

(d)    The Dealer shall advise each offeree of Shares in the Company at the time of the initial offering to such offeree that the Company shall, during the course of the Offering and a reasonable time before sale, accord offeree and offeree's agents or representatives, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain any additional information, to the extent possessed or obtainable by the Company without unreasonable effort or expense, that is necessary to verify the accuracy of the information contained in the Private Placement Memorandum.

(e)    Before the sale of any of the Shares, the Dealer shall make reasonable inquiry to determine if the offeree is acquiring the Shares for offeree's own account or on behalf of other persons, and that the offeree understands the limitations on the

offeree's disposition of the Shares set forth in Rule 502(d) of Regulation D. This includes a determination by the Dealer that the offeree understands that he must bear the economic risk of the investment for an indefinite period of time because the Shares have not been registered under the Securities Act and, thus, cannot be sold unless the Shares are subsequently registered under the Securities Act or an exemption from registration under the Securities Act is available.

(f)     Before the sale of any of the Shares, the Dealer shall:

(1)     have reasonable grounds to believe that each subscriber is an "accredited investor" as that term is then defined in Rule 501(a) of Regulation D; and

(2)     have sufficient information concerning the offeree to determine that the offeree has such knowledge and experience in financial and business matters that the offeree is capable of evaluating the merits and risks of an investment in the Company.

(g)     The Dealer shall not distribute a Private Placement Memorandum, supplement or amendment thereto or any supplemental information to any offeree with whom the Dealer does not have a pre-existing substantive relationship, as defined from time to time by the SEC. The SEC makes this determination on a case-by-case basis, taking into account all relevant facts and circumstances. However, generally, such relationship must exist before the date on which the Dealer enters into this Agreement and must allow the Dealer to determine and understand the prospective investor's investment objectives, sophistication and financial situation and whether an investment in the Shares is suitable for such prospective investor.

(h)     The Dealer shall complete and deliver to the Company such certifications or other documentation requested by such parties regarding the Dealer's determinations referenced in paragraphs (d) through (g) above, including, without limitation, a certificate stating the number of each Private Placement Memorandum delivered to each offeree, and a confirmation that the Dealer reasonably believes that each such offeree is an "accredited investor" as that term is then defined in Rule 501(a) of Regulation D.

(i)  Shares shall not be sold by the Dealer to any non-accredited investors.

9.     The Dealer represents that neither it, nor any of its directors, executive officers, general partners, managing members or other officers participating in the offering of Shares, nor any of the directors, executive officers or other officers participating in the offering of Shares of any such general partner or managing member, nor any other officers, employees or associated persons of the Dealer or any such general partner or managing member that have been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of any Shares (each, a "**Dealer**

**EXHIBIT E, PAGE 15**

Covered Person" and, together, "**Dealer Covered Persons**"), is subject to any Disqualification Event except for a Disqualification Event (i) contemplated by Rule 506(d)(2) of the Securities Act and (ii) a description of which has been furnished in writing to the Company prior to the date hereof.

10. The Dealer represents that it is not a party to any agreement other than this Agreement regarding the payment (directly or indirectly) of remuneration for solicitation of purchasers in connection with the sale of any Shares. The Dealer will notify the Company of any such agreement entered into between the Dealer and any other person.

11. The representations and warranties in Sections 8.9 and 8.10 above are and shall be continuing representations and warranties throughout the term of the Offering. The Dealer will notify the Company in writing promptly upon the occurrence of (i) any Disqualification Event relating to any Dealer Covered Person not previously disclosed to the Company in accordance with Section 8.9 above, and (ii) any event that would, with the passage of time, become a Disqualification Event relating to any Dealer Covered Person.

12. The Dealer shall provide to the Company such certifications, documentation and other information as reasonably requested from time to time by the Company as such parties deem necessary or advisable to carry out the exercise of reasonable care under Rule 506(d) and (e) under the Securities Act in connection with this Offering.

13. The Dealer shall notify the Company of Subscription Agreements it receives within two (2) business days of receipt so that the Company may make any required federal or state law filings.

14. The Dealer will furnish to the Company upon request a complete list of all persons who have been offered the Shares (including the corresponding number of the Private Placement Memorandum delivered to such persons) and such persons' places of residence.

15. The Dealer will immediately bring to the attention of the Company any circumstance or fact which causes the Dealer to believe the Private Placement Memorandum, or any Authorized Sales Materials (as defined in Section IX below), or any information supplied to prospective subscribers in their subscription materials, may be inaccurate or misleading.

16. The Dealer agrees to be bound by the terms of the Escrow Agreement dated December 7, 2017, among UMB Bank, N.A., as escrow agent, and the Company, a copy of which is attached hereto as **Exhibit B**, and the Dealer further agrees that it will not represent or imply that UMB Bank, N.A., as the escrow agent identified in the Private Placement Memorandum, has investigated the desirability or advisability of an investment in the Company or has approved, endorsed or passed upon the merits of the Shares or of the Company, nor will the Dealer use the name of said escrow agent in any manner whatsoever in connection with the offer or sale of the Shares other than by acknowledgment that it has agreed to serve as escrow agent.

17.The Dealer has submitted (or will submit within 15 days of the first sale in the Offering) to FINRA a copy of the Private Placement Memorandum and any other related offering documents, including any materially amended versions thereof in accordance with the requirements of FINRA Rule 5123.

## IX.    Private Placement Memorandum and Sales Literature

Dealer is not authorized or permitted to give, and will not give, any information or make any representation (written or oral) concerning the Shares except as set forth in the Private Placement Memorandum as amended and supplemented or in the printed sales literature or other materials authorized by the Company for delivery to investors in this Offering ("**Authorized Sales Materials**"). The Company will supply Dealer with reasonable quantities of the Private Placement Memorandum, including amendments of and supplements to the Private Placement Memorandum, and any Authorized Sales Materials, for delivery to investors, with each such initial Private Placement Memorandum and any amended Private Placement Memorandum being numbered.  Dealer will deliver a copy of the Private Placement Memorandum, including any amendments and supplements thereto, each identified by number, to each investor to whom an offer is made prior to or simultaneously with the first solicitation of an offer to sell the Shares to an investor. When a supplement or amendment to the Private Placement Memorandum is prepared and delivered to the Dealer by the Company after delivery of the Private Placement Memorandum to an investor, the Dealer shall distribute each such supplement or amendment to the Private Placement Memorandum to every person who has previously received a copy of the Private Placement Memorandum from the Dealer. The Dealer shall keep memoranda in its records indicating to whom each Private Placement Memorandum, supplement or amendment thereto, and supplemental material was delivered, which memoranda shall further indicate by number to whom each initial Private Placement Memorandum and any amended and restated Private Placement Memorandum was delivered.  The Dealer further agrees to make such records available to the Company upon request and to make them available to representatives of the SEC and FINRA and applicable state securities administrators upon the Dealer's receipt of a subpoena or other appropriate document request from such agency.  Dealer will not send or give any Authorized Sales Materials to an investor unless the Authorized Sales Materials are accompanied by or preceded by the Private Placement Memorandum as amended and supplemented.

Except for the Authorized Sales Materials, the Company has not authorized the use of any supplemental literature or sales materials in connection with the Offering and the Dealer agrees not to use any material unless it has been authorized by the Company and provided to the Dealer by the Company.  Dealer agrees that it will not show or give to any investor or prospective investor or reproduce any material or writing that is supplied to it by the Company and marked "broker-dealer use only" or otherwise bearing a legend denoting that it is not to be used in connection with the sale of Shares to members of the public. Dealer agrees that it will not show or give to any investor or prospective investor in a particular jurisdiction any material or writing that is supplied to it by the Company if such material bears a legend denoting that it is not to be used in connection with the sale of Shares to members of the public in such jurisdiction.

Dealer agrees that it will not use in connection with the offer or sale of Shares any material or writing that relates to another company supplied to it by the Company bearing a legend that states that such material may not be used in connection with the offer or sale of any securities of the Company.    On becoming a Dealer, and in offering and selling Shares, the Dealer agrees to comply with all the applicable requirements under the Securities Act, the Exchange Act, applicable rules and regulations promulgated by the SEC, including Regulation D promulgated under the Securities Act, and applicable state securities laws and regulations.

**X.      License and Association Membership**

Dealer represents and warrants to the Company that it is a properly registered or licensed broker-dealer, duly authorized to offer and sell Shares under federal securities laws and regulations and the securities laws and regulations of all states where it offers or sells Shares and that it is a member of FINRA in good standing.  This Agreement shall automatically terminate if the Dealer ceases to be a member of FINRA in good standing or is subject to a FINRA suspension or if the Dealer's registration or license under the Exchange Act or any state securities laws or regulations is terminated or suspended; the Dealer agrees to notify the Company immediately if any of these events occur.

**XI.     Indemnification**

1.      The Company will indemnify and hold harmless the Dealer, its officers and directors and each person, if any, who controls the Dealer within the meaning of Section 15 of the Securities Act (collectively, the "**Indemnified Persons**") from and against any losses, claims, damages or liabilities, joint or several (collectively, the "**Losses**"), to which such Indemnified Persons may become subject, under the Securities Act, the Exchange Act or otherwise, insofar as such Losses (or actions in respect thereof) arise out of or are based upon (a) any untrue statement or alleged untrue statement of a material fact contained (i) in the Private Placement Memorandum or any amendment or supplement thereto or (ii) in any federal or state securities filing or other document executed by the Company or on its behalf specifically for the purpose of exempting any or all of the Shares from the registration requirements under the securities laws of any jurisdiction or based upon information furnished by the Company under the securities laws thereof (any such application, document or information being hereinafter called a "**Filing**"), or (iii) in any Authorized Sales Materials, or (b) the omission or alleged omission to state in the Private Placement Memorandum or any amendment or supplement thereto, or in any Filing or Authorized Sales Materials, a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading. The Company will reimburse each Indemnified Person for any legal or other expenses reasonably incurred by such Indemnified Person in connection with investigating or defending such Loss.

Notwithstanding the foregoing provisions of this Section 11.1, the Company will not be liable in any such case to the extent that any such Loss or expense arises out of or is based upon

an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Dealer, specifically for use in the preparation of the Private Placement Memorandum or any such amendment or supplement thereto, any such Filing or any Authorized Sales Material; and further, the Company will not be liable in any such case if it is determined that the Dealer was at fault in connection with the Loss, expense or action.

The foregoing indemnity agreement of this Section 11.1 is subject to the further condition that, insofar as it relates to any untrue statement, alleged untrue statement, omission or alleged omission made in the Private Placement Memorandum (or amendment or supplement thereto) that was eliminated or remedied in any subsequent amendment or supplement thereto, such indemnity agreement shall not inure to the benefit of an Indemnified Person from whom the person asserting any Losses purchased the Shares that are the subject thereof, if a copy of the Private Placement Memorandum as so amended or supplemented was not sent or given to such person at or prior to the time the subscription of such person was accepted by the Company, but only if a copy of the Private Placement Memorandum as so amended or supplemented had been supplied to the Dealer prior to such acceptance.

2.      The Dealer will indemnify and hold harmless the Company, each of its officers and directors, and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act (the "**Dealer Indemnified Persons**") from and against any Losses to which a Dealer Indemnified Person may become subject, under the Securities Act, the Exchange Act or otherwise, insofar as such Losses (or actions in respect thereof) arise out of or are based upon (a) any untrue statement or alleged untrue statement of a material fact contained (i) in the Private Placement Memorandum or any amendment or supplement thereto, (ii) in any Filing, or (iii) in any Authorized Sales Materials; (b) the omission or alleged omission to state in the Private Placement Memorandum or any such amendment or supplement thereto, in any Filing or in any Authorized Sales Materials, a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, provided that clauses (a) and (b) apply to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Dealer specifically for use with reference to the Dealer in the preparation of the Private Placement Memorandum or any such amendment or supplement thereto or any such Filing or Authorized Sales Materials; (c) any use of sales literature not authorized or approved by the Company or any use of "broker-dealer use only" materials with members of the public by the Dealer in the offer and sale of the Shares or any use of sales literature in a particular jurisdiction if such material bears a legend denoting that it is not to be used in connection with the sale of Shares to members of the public in such jurisdiction; (d) any untrue statement made by the Dealer or its representatives or agents or omission to state a fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading in connection with the offer and sale of the Shares; (e) any material violation of this Agreement; (f) any failure to comply with applicable laws governing privacy issues, money laundering abatement and anti-terrorist financing efforts, including applicable rules of the SEC, FINRA and the USA PATRIOT Act of 2001 and the regulations and programs administered by the OFAC at the U.S. Department of the Treasury; (g) any other failure to comply with applicable rules of FINRA or federal or state securities laws and the rules and regulations promulgated thereunder; or (h) the failure by any subscriber of a Share to comply with the Investor Suitability Requirements set forth in the section captioned "Who May Invest" in the Private Placement Memorandum.  The Dealer will reimburse each Dealer Indemnified Person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such Loss, expense or action.  This indemnity agreement will be in addition to any liability that the Dealer may otherwise have.

3.      Promptly after receipt by an indemnified party under this Section XI of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section XI, notify in writing the indemnifying party of the commencement thereof. The failure of an indemnified party to so notify the indemnifying party will relieve such indemnifying party from any liability under this Section XI as to the particular item for which indemnification is then being sought, but not from any other liability that it may have to any indemnified party. In case any such action is brought against any indemnified party, and it notifies an indemnifying party of the commencement thereof, the indemnifying party will be entitled, to the extent it may wish, jointly with any other indemnifying party similarly notified, to participate in the defense thereof, with separate counsel. Such participation shall not relieve such indemnifying party of the obligation to reimburse the indemnified party for reasonable legal and other expenses (subject to Section 11.4) incurred by such indemnified party in defending itself, except for such expenses incurred after the indemnifying party has deposited funds sufficient to effect the settlement, with prejudice, of the claim in respect of which indemnity is sought. Any such indemnifying party shall not be liable to any such indemnified party on account of any settlement of any claim or action effected without the consent of such indemnifying party. Any indemnified party shall not be bound to perform or refrain from performing any act pursuant to the terms of any settlement of any claim or action effected without the consent of such indemnified party.

4.      The indemnifying party shall pay all legal fees and expenses of the indemnified party in the defense of such claims or actions for which indemnification is sought pursuant to this Section XI; provided, however, that the indemnifying party shall not be obligated to pay legal expenses and fees to more than one law firm in connection with the defense of similar claims arising out of the same alleged acts or omissions giving rise to such claims notwithstanding that such actions or claims are alleged or brought by one or more parties against more than one indemnified party. If such claims or actions are

alleged or brought against more than one indemnified party, then the indemnifying party shall only be obliged to reimburse the expenses and fees of the one law firm that has been selected by a majority of the indemnified parties against which such action is finally brought; and in the event a majority of such indemnified parties is unable to agree on which law firm for which expenses or fees will be reimbursable by the indemnifying party, then payment shall be made to the first law firm of record representing an indemnified party against the action or claim. Such law firm shall be paid only to the extent of services performed by such law firm and no reimbursement shall be payable to such law firm on account of legal services performed by another law firm.

## XII.   Anti-Money Laundering Compliance Programs

Dealer's acceptance of this Agreement constitutes a representation to the Company that the Dealer has established and implemented an anti-money laundering and customer identification compliance program ("**AML Program**") in accordance with applicable laws and regulations, including federal and state securities laws, applicable rules of FINRA, and the Bank Secrecy Act, Title 31 U.S.C. Sections 5311-5355, as amended by the USA Patriot Act of 2001, and related regulations (31 C.F.R. Part 103), and will continue to maintain its AML Program consistent with applicable laws and regulations during the term of this Agreement.

In accordance with these applicable laws and regulations and its AML Program, Dealer agrees to verify the identity of its new customers; to maintain customer records; to check the names of new customers against government watch lists, including the Office of Foreign Asset Control's (OFAC) list of Specially Designated Nationals and Blocked Persons. Additionally, Dealer will monitor account activity to identify patterns of unusual size or volume, geographic factors and any other "red flags" described in the USA Patriot Act as potential signals of money laundering or terrorist financing. Dealer will submit to the Financial Crimes Enforcement Network any required suspicious activity reports about such activity and further will disclose such activity to applicable federal and state law enforcement when required by law. Upon request by the Company at any time, the Dealer hereby agrees to furnish (a) a copy of its AML Program to the Company for review, and (b) a copy of the findings and any remedial actions taken in connection with Dealer's most recent independent testing of its AML Program.

## XIII.   Effectiveness, Termination and Amendment

This Agreement shall become effective upon the execution hereof by the Dealer and the receipt of this executed Agreement by the Company.  Dealer will immediately suspend or terminate its offer and sale of Shares upon the request of the Company at any time and will resume its offer and sale of Shares hereunder upon subsequent request of the Company.  In addition to termination pursuant to Section X, any party may terminate this Agreement by written notice, which termination shall be effective 48 hours after such notice is given.  Upon the sale of all of the Shares, this Agreement shall terminate without obligation on the part of the Dealer or the Company, except as set forth in this Agreement.  The respective agreements and obligations of the Company and the Dealer set forth in Sections IV, V, VI, 8.2, 8.5, 8.6, 8.7, IX, XI and XIII through XXV of this Agreement shall remain operative and in full force and effect regardless of the termination of this Agreement.

This Agreement may be amended at any time by the Company by written notice to the Dealer.  Any such amendment shall be deemed accepted by the Dealer upon the Dealer placing an order for the sale of Shares after it has received such notice.

## XIV.   Privacy Laws

The Dealer agrees as follows:

1.      The Dealer agrees to abide by and comply in all respects with (a) the privacy standards and requirements of the Gramm-Leach-Bliley Act of 1999 ("**GLBA**") and applicable regulations promulgated thereunder, (b) the privacy standards and requirements of any other applicable federal or state law, including the Fair Credit Reporting Act ("**FCRA**") and (c) its own internal privacy policies and procedures, each as may be amended from time to time;

2.      Dealer shall not disclose nonpublic personal information (as defined under the GLBA) of all customers who have opted out of such disclosures, except to service providers (when necessary and as permitted under the GLBA) or as otherwise required by applicable law;

3.      Except as expressly permitted under the FCRA, Dealer shall not disclose any information that would be considered a "consumer report" under the FCRA; and

4.      Dealer shall be responsible for determining which customers have opted out of the disclosure of nonpublic personal information by periodically reviewing and, if necessary, retrieving a list of such customers (the "**List**") to identify customers that have exercised their opt-out rights.  In the event either party expects to use or disclose nonpublic personal information of any customer for purposes other than servicing the customer, or as otherwise required by applicable law, that party must first consult the List to determine whether the affected customer has exercised his or her opt-out rights.  Each party understands that it is prohibited from using or disclosing any nonpublic personal

information of any customer that is identified on the List as having opted out of such disclosures.

## XV.   Customer Complaints

The Dealer agrees to promptly provide to the Company copies of any written or otherwise documented complaints from customers of the Dealer received by the Dealer relating in any way to the Offering (including, but not limited to, the manner in which the Shares are offered by the Dealer).

## XVI.   Notice

All notices to the Company shall be in writing addressed to the Company at the address set forth below.  All notices to Dealer shall be in writing addressed to the Dealer at the address specified by the Dealer at the end of this Agreement.  Notices addressed to the intended recipient as described above will be duly given (a) when personally delivered or by commercial messenger, (b) one business day following deposit with a recognized overnight courier service, provided such deposit occurs prior to the deadline imposed by such service for overnight delivery; or (c) when transmitted, if sent by facsimile copy, provided confirmation of receipt is received by sender and such notice is sent by an additional method provided hereunder.

To the Company:     EquiAlt Secured Income Portfolio REIT, Inc.
                                720 E. Henderson Avenue
                                Tampa, Florida 33602

## XVII.   Confidentiality

In connection with the Dealer's due diligence review of the Offering, the Dealer (or its agent performing due diligence) may request receipt of confidential information regarding the Offering, the Company, the Company's sponsor or the sponsor's affiliates.  The Company will reasonably cooperate with the Dealer to accommodate such request; provided, however, any such information provided to Dealer or its agent will be subject to the terms of the confidentiality agreement attached as Appendix A to this Agreement. **The parties hereto acknowledge and agree that the terms of the confidentiality agreement attached as Appendix A hereto are also intended to directly benefit the Company and EquiAlt Capital Advisors LLC ("EquiAlt CA"), its subsidiaries and/or affiliates (which group includes, but is not limited to, EquiAlt Holdings LLC ("EquiAlt Holdings"), and investment programs sponsored by EquiAlt Holdings and/or its respective subsidiaries and/or affiliates (whether such programs are sponsored directly or through joint ventures)), and joint venture partners of EquiAlt Holdings and EquiAlt CA and their affiliates, all of which are intended third-party beneficiaries of the Dealer's obligations under the confidentiality agreement attached as Appendix A hereto and each of which has the right to enforce its terms at law or at equity,**

including the right to seek injunctive relief, against the Dealer.

## XVIII. Entire Agreement

This Agreement and the exhibits hereto are the entire agreement of the parties and supersede all prior agreements, if any, relating to the subject matter hereof between the parties hereto.

## XIX.   Successors and Assigns

No party shall assign this Agreement or any right, interest or benefit under this Agreement without the prior written consent of the other party.  This Agreement shall be binding upon the Company and the Dealer and their respective successors and permitted assigns.

## XX.   Dispute Resolution and Applicable Law

20.1    Any dispute, claim, controversy or difference which may arise between or among any two or more parties having rights under this Agreement shall, if possible, be settled by mutual consultation in good faith between the parties.  Such mutual consultation shall take place as soon as practicable after the receipt by one party or a written notice from another party describing the dispute, controversy or difference between them.  In the event that the dispute is not resolved to the satisfaction of all involved parties by such consultation within fortyfive (45) days of the written notice given to one party pursuant to this Section 20.1, a party to the dispute may initiate the arbitration procedure set forth below.  Such arbitration shall be the exclusive method for resolving any such unresolved disputes.

20.2    Any unresolved dispute, controversy, difference or claim will be subject to binding arbitration in New York City, New York, before a single arbitrator (the **"Arbitrator"**), in accordance with the rules and procedures of the American Arbitration Association and consistent with the provisions of this Section XX.  The Arbitrator shall be independent and shall be selected by mutual agreement of the parties involved or, in the absence of such agreement, by two other arbitrators, one of each selected by the disputing parties in their discretion.  The parties acknowledge that the following conditions apply to such arbitration:  (1) arbitration is final and binding on the parties; (2) the parties are waiving their right to seek remedies in court, including the right to jury trial; (3) prearbitration discovery is generally more limited than and different from court proceedings; and (4) the Arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings is strictly limited.  Judgment upon such arbitration award may be entered in any court having jurisdiction over the parties or their assets.

20.3    If any arbitration, legal action or other proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the substantially prevailing party (as determined by the arbitrator) shall be entitled to recover reasonable

**EXHIBIT E, PAGE 24**

attorneys' fees and other costs incurred in that action or proceeding (and any additional proceeding for the enforcement of a judgment) in addition to any other relief to which it or they may be entitled.

    20.4   This Agreement shall be construed under the laws of the State of New York, without regard to its conflict of law provisions; provided, however, that the governing law for causes of action for violations of federal or state securities law shall be governed by the applicable federal or state securities law.

## XXI.   Severability

    The invalidity or unenforceability of any provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.

## XXII.   Counterparts

    This Agreement may be executed in any number of counterparts.  Each counterpart, when executed and delivered, shall be an original contract, but all counterparts, when taken together, shall constitute one and the same agreement.

## XXIII. ERISA Matters.

    The Dealer acknowledges and agrees as follows:

1.    The Company, EquiAlt CA, the sponsor of the Company and each of their respective affiliates and related parties (collectively, the "**EquiAlt Parties**"), may engage in sales and marketing activities with the Dealers.  These activities may include, without limitation, attending meetings, conferences and forums, as well as making offering materials, sales literature, educational materials and other resources available in connection with sales and marketing activities regarding the Company to the Dealers and their respective affiliates.

2.    With respect to any of the Dealer's customers which is a plan, plan fiduciary, plan participant or beneficiary, individual retirement account ("**IRA**") or IRA owner subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**") (collectively, "**Retirement Customers**"), the EquiAlt Parties are not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with any transaction in the Company ("**Transaction**").

3.    Certain of the EquiAlt Parties have financial interests associated with the purchase of Shares of the Company, including the fees, expense reimbursements

and other payments they anticipate receiving in connection with the purchase of Shares of the Company, as described in the Private Placement Memorandum.

4.   The EquiAlt Parties are not receiving a fee or other compensation directly from the Dealer or any of their Retirement Customers for the provision of investment advice (as opposed to other services) in connection with any Transaction.

5.   By continuing to advise the Dealer's Retirement Customers with respect to any Transaction in the Company, the Dealer represents and warrants that:

   (a)   The Dealer is a broker dealer registered under the Exchange Act;

   (b)   There is no financial interest, ownership interest, or other relationship, agreement, or understanding that would limit the Dealer's ability to carry out its fiduciary responsibility to any of its Retirement Customers beyond the control, direction, or influence of other persons involved in the Transaction;

   (c)   The Dealer is capable of evaluating investment risk independently, both in general and with regard to particular transactions and investment strategies; and

   (d)   The Dealer is a fiduciary under ERISA or the Code, or both, with respect to the Transaction, and the Dealer is responsible for exercising independent judgment in evaluating the Transaction, with respect to its Retirement Customers.

**XXIV. No Partnership**

Nothing in this Agreement shall be construed or interpreted to constitute the Dealer as an employee, agent or representative of, or in association with or in partnership with the Company or the other Dealers; instead, this Agreement shall only constitute the Dealer as a dealer authorized to sell the Shares according to the terms set forth in the Private Placement Memorandum as amended and supplemented and in this Agreement.

**XXV.   Confirmation**

The Company agrees to confirm all orders for the purchase of Shares that are accepted by the Company.

*[signature page follows]*

THE COMPANY:

Attest:                                  EQUIALT SECURED INCOME PORTFOLIO
                                         REIT, INC.

By: _____            By: _____
    Name                                     Name

    _____                _____
    Title                                    Title


We have read the foregoing Agreement and we hereby accept and agree to the terms and
conditions set forth therein.  We hereby represent that the list below of jurisdictions in which we
are registered or licensed as a broker or dealer and are fully authorized to sell securities is true
and correct, and we agree to advise you of any change in such list during the term of this
Agreement.

1.      Identity of Dealer:

        Name: _____ Robert Armijo _____

        Type of entity: _____ LLC _____
                            (corporation, partnership or proprietorship)


        Organized in the State of: _____ CA _____
                                        (State)

        Licensed as broker-dealer in the following States: _____ N/A series 65 ____

        _____

        Tax I.D. #: _____

**EXHIBIT E, PAGE 27**

2.    Person to receive notice pursuant to Section XVI:

Name:_____

Company:_____

Address:_____

City, State and Zip Code:_____

Telephone No.:  (_____)_____

Telefax No.:     (_____)_____

E-mail Address:  _____

AGREED TO AND ACCEPTED BY THE DEALER:

_____
     (Dealer's Firm Name)

By:_____
     Authorized Signature

Title:_____

**EXHIBIT E, PAGE 28**

APPENDIX A

Dealer Confidentiality Agreement

EquiAlt Capital Advisors LLC ("EquiAlt CA"), its subsidiaries and/or affiliates  (which group includes, but is not limited to, EquiAlt Holdings LLC ("EquiAlt Holdings") and investment programs sponsored by EquiAlt Holdings and/or its respective subsidiaries and/or affiliates (whether such programs are sponsored directly or through joint ventures)), and joint venture partners of EquiAlt Holdings  and EquiAlt CA and their affiliates (collectively, "EquiAlt"), may disclose Confidential Information (as defined below) to Dealer and its Representatives (as defined below), in connection with their due diligence efforts in respect of one or more offerings of securities sponsored by EquiAlt (the "Offerings").  This Appendix A constitutes part of the Selected Dealer Agreement between the Company and Dealer (the "Selected Dealer Agreement") and sets forth the agreements and understandings among the Company, Dealer and EquiAlt with respect to the disclosure of Confidential Information.

1.    General.   As a condition to receiving such Confidential Information, Dealer hereby agrees that it and its Representatives will: (i) hold all such Confidential Information in trust and in the strictest confidence, (ii) protect such Confidential Information from disclosure in accordance with a standard of care that shall be no less than the care such party uses to protect its own confidential information of like importance but in no event with less than reasonable care, (iii) treat all such Confidential Information in accordance with the provisions of this Appendix A and (iv) take or abstain from taking certain other actions hereinafter set forth.

Prior to the receipt of any Confidential Information, each Representative shall have been made aware of and have agreed to be bound by the terms set forth in this Appendix A.  Neither the Dealer nor any of its Representatives shall use, copy, disclose, disseminate, or permit any unauthorized person access to, any Confidential Information without EquiAlt's prior written consent. The Dealer and its Representatives may, with EquiAlt's prior written consent, communicate Confidential Information to another broker-dealer that has entered into a separately-negotiated confidentiality agreement with EquiAlt (which agreement with EquiAlt shall be in substantially the form hereof). Any such Confidential Information disseminated pursuant to the immediately preceding sentence shall remain confidential notwithstanding any such communication to another person. To the extent Confidential Information is provided by Dealer pursuant to the terms hereof, the Dealer and each Representative shall ensure that any existing confidentiality notices included on or with the Confidential Information are included in any such disclosures or, if no such notices are included, "Confidential" or some similar notice is stamped on the Confidential Information.

For purposes of this Appendix A, the term "Representative" shall include an officer, director, manager, employee, owner, member or partner of Dealer performing a due diligence review of EquiAlt, a consultant, due diligence provider, accountant or attorney of Dealer

performing a due diligence review of EquiAlt on behalf of Dealer, and any person or committee, as the case may be, responsible for determining whether Dealer will participate in the Offerings, provided that in each case, such person has a need to know such information; provided further that, in no event, may such information be shared with any person involved in retail selling efforts related to any Offerings.

2. <u>Confidential Information</u>.  For purposes hereof, "<u>Confidential Information</u>" means all information concerning the business, financial condition, operations, prospects, assets and liabilities of EquiAlt (including materials and matters provided to and discussed by the board of directors of EquiAlt and the committees of the board) that EquiAlt believes is either confidential, proprietary or otherwise not generally available to the public, whether prepared by EquiAlt, its advisors or otherwise (including information received by EquiAlt from third parties under confidential conditions) and which is furnished to Dealer or any of its Representatives in writing, orally or by any other means in connection with the Offerings, and includes all analyses, notes, compilations, summaries, studies or other documents, records or data prepared by Dealer or its Representatives which contain, reflect or are generated from, such information.   However, Confidential Information shall not include information that: (A) is generally available to the public other than as a result of a disclosure by the Dealer or its Representatives in breach of this <u>Appendix A</u>; (B) is known to the Dealer or its Representatives prior to the date of the Selected Dealer Agreement; provided, that, such information is not known by the Dealer or its Representatives to be subject to another confidentiality agreement with, or other obligation or undertaking of secrecy to EquiAlt; (C) is independently disclosed to the Dealer or its Representatives by a third-party which the Dealer or its Representative reasonably believes has a bona fide right to do so without violating any obligation of confidentiality or (D) is developed by the Dealer or any of its Representatives completely independent of any information disclosed to the Dealer or any of its Representatives in connection with their due diligence review.

3. <u>Legally Required Disclosures</u>.   In the event that the Dealer or any of its Representatives is requested or required (by deposition, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) by any court or governmental agency or authority or other supervisory body, or by application of law, regulation or legal or regulatory process to disclose any of the Confidential Information, the Dealer shall: (A) provide EquiAlt with prompt written notice of any such request or requirement so that EquiAlt may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this <u>Appendix A</u>, (B) if the Dealer or any of its Representatives is required based upon the advice of their respective legal counsel, to disclose Confidential Information, the Dealer or such Representative may, without liability hereunder, disclose only that portion of the Confidential Information which such legal counsel advises is legally required to be disclosed; provided, that, the Dealer or such Representative exercises reasonable efforts to otherwise preserve the confidentiality of the Confidential Information and (C) upon reasonable notice, the Dealer and its Representatives will cooperate with EquiAlt in obtaining a protective order or other appropriate remedy reasonably limiting disclosure to appropriate parties relating to the applicable proceeding; provided, that, the foregoing (i) shall

not require the Dealer or its Representatives to delay production of any Confidential Information and (ii) shall apply only to the extent that EquiAlt bears all costs and expenses of such cooperation, including, but not limited to, payment to the Dealer or its Representative, as applicable, for time expended by its staff relating to any such efforts at its then current billing rates and reimbursement of all reasonable attorney's fees and costs of legal counsel associated therewith. Neither the Dealer nor any of its Representatives is required to take any action pursuant to clause (C) of the immediately preceding sentence without reasonable assurances from EquiAlt that such payment and reimbursement will be provided.

4.   Ownership of Confidential Information. Confidential Information, including any copies, printouts and summaries thereof, shall remain the property of EquiAlt and all applicable rights in patents, copyrights, trade secrets and similar intellectual property rights embodied in the Confidential Information shall remain in EquiAlt.

5.   Return of Confidential Information. Except for due diligence files and copies maintained to comply with applicable rules and regulations upon advice of counsel, Dealer agrees promptly upon EquiAlt's written request to return all written material, including copies or printouts and summaries thereof, and destroy all material held by Dealer or any of its Representatives in electronic form (including material on disks or tapes) containing Confidential Information, submitted to Dealer or its Representatives or prepared by Dealer or its Representatives based upon such Confidential Information. Notwithstanding the return or destruction of Confidential Information, Dealer and its Representatives will continue to hold in confidence all Confidential Information and be bound by their respective obligations under the terms of this Appendix A.

6.   Remedies. Each party agrees that the obligations hereunder are necessary and reasonable in order to protect EquiAlt and its business, and expressly agrees that monetary damages would not be a sufficient remedy for any violation of the terms of this Appendix A and, accordingly, EquiAlt shall be entitled to seek equitable relief, including, but not limited to, specific performance and injunctive relief as remedies for any violation, including, without limitation, the actual or threatened disclosure of Confidential Information without the prior written consent of EquiAlt. Such remedies shall not be deemed to be exclusive remedies for a violation of the terms of this Appendix A, but shall be in addition to all other remedies available to EquiAlt at law or equity. The Dealer agrees that neither it nor any of its Representatives will raise the defense of an adequate remedy at law in any action seeking equitable relief. The Dealer shall indemnify and hold harmless EquiAlt from and against all liabilities, obligations, claims, damages, penalties, causes of action costs and expenses (including reasonable attorneys' fees and expenses actually incurred) imposed upon or incurred by or asserted against EquiAlt by reason of a violation of the terms of this Appendix A by the Dealer or any of its Representatives.

7.   Waiver. No delay or failure in exercising any rights hereunder shall be construed to be a waiver of such rights, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right hereunder.

8.    Governing Law.   THIS APPENDIX A SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.   EACH OF THE PARTIES HEREBY AGREE AND SUBMIT TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED WITHIN THE STATE OF CALIFORNIA FOR THE RESOLUTION OF ANY DISPUTE THAT MAY ARISE UNDER THIS APPENDIX A, AND THAT THE STATE AND FEDERAL COURTS LOCATED WITHIN THE STATE OF CALIFORNIA HAVE EXCLUSIVE JURISDICTION FOR ANY SUCH DISPUTES.

9.    Severability.  If for any reason any provision of this Appendix A shall be declared void or invalid, such declaration shall not affect the validity of the remainder of this Appendix A which shall remain in full force and effect as if executed with the void or invalid provision eliminated.

10.    Binding Agreement.  This Appendix A shall be binding upon, and shall inure to the benefit of EquiAlt (including each of the entities included in the definition of "EquiAlt" in the preamble to this Agreement), the Dealer and their respective successors in interest.

11.    Non-Assignment.   This Appendix A, and the rights and obligations hereby created, may not be assigned by the Dealer without the express written consent of EquiAlt.

12.    Entire Agreement.   This Appendix A constitutes the entire agreement and supersedes and replaces any prior or existing agreement relating to treatment of Confidential Information relating to EquiAlt and the Offerings.

13.    Captions.  The captions contained in this Appendix A are for convenience only, form no part of this Appendix A and shall not in any manner amplify, limit, modify or otherwise affect the interpretation of this Appendix A.