UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>v.<br><br>ROBERT JOSEPH ARMIJO, and JOSEPH FINANCIAL, INC.,<br><br>                     Defendants. | Case No.:  21-CV-1107 TWR (RBB)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF Nos. 24, 26) |

Presently before the Court are the cross-motions for summary judgment (the "Motions") filed by Plaintiff the Securities and Exchange Commission ("SEC") ("Pl.'s MSJ," ECF No. 24) and Defendants Robert Joseph Armijo and Joseph Financial, Inc. ("JFI") ("Defs.' MSJ," ECF No. 26).  The Motions are fully briefed, (*see* ECF Nos. 34–35, 38–40), and the Court held a hearing on February 23, 2023.  (*See* ECF No. 44.)  Having carefully considered the Parties' arguments, the record, and the applicable law, the Court **GRANTS** Plaintiff's Motion and **DENIES** Defendants' Motion, as follows.

/ / /

/ / /

/ / /

/ / /

# BACKGROUND

## I.  Undisputed Material Facts

The Parties have agreed to the following undisputed material facts:

### A.  *The Underlying Securities*

"In 2011, Brian Davison . . . formed EquiAlt, LLC ("EquiAlt"), in Nevada, to be used as a manager of real estate investment funds ("Fund Manager")."  (*See* ECF No. 39 ("Jt. Stmt.") ¶ 3.)  "EquiAlt retained securities counsel, Paul Wassgren . . . , and his firms, Fox Rothschild LLP and then DLA Piper LLP, to form legal entities to be used as real estate investment funds and to raise capital for the funds through offerings of securities."  (*Id.* ¶ 4; *see also id.* ¶ 26.)  "Wassgren remained counsel to EquiAlt and the Funds through 2020, and was counsel at all times that Defendants acted as agents for the Fund Manager and Funds."  (*Id.* ¶ 5.)

"From 2011 to 2019, EquiAlt formed at least four real estate investment funds (collectively, "Funds"): (1) EquiAlt Fund, LLC ("Fund I"); (2) EquiAlt Fund II, LLC ("Fund II"); (3) EquiAlt Fund III ("Fund III"); and (4) EA SIP, LLC ("EA SIP Fund")[.]"[1]  (*Id.* ¶ 6; *see also id.* ¶ 10.)  "Each Fund issued its own securities," (*id.* ¶ 7), in the form of "debentures . . . providing a fixed annual return of 8% to 12%."  (*See id.* ¶ 9.)  "None of the Funds' securities were ever listed or traded on any exchange facility, such as a national securities exchange or an over-the-counter market."  (*Id.* ¶ 8.)  Further, "[t]he EquiAlt Funds were not registered with the SEC at any time during the period from February 1, 2016[,] to February 22, 2020."  (*Id.* ¶ 16.)

"EquiAlt hired Wassgren and members of his various law firms, to draft, among other documents, a Private Placement Memorandum ("PPM") and Prospective Purchaser Questionnaire ("PPQ") for each Fund's offering (individually, "Fund Offering;" collectively, "Fund Offerings")."  (*Id.* ¶ 11.)  "The PPQ defined 'accredited investor' and instructed potential investors to identify whether they were 'accredited' under such

---

[1] "Defendants did not engage in any activities on behalf of Fund III."  (Jt. Stmt. ¶ 21.)

definition and sign and date the document." (*Id.* ¶ 12.) "Each PPM contained information about the particular Fund Offering[] but did not include financial statements for the Fund." (*Id.* ¶ 13.) "Each PPM for each Fund stated in capital letters 'THE SECURITIES HAVE NOT BEEN REGISTERED WITH NOR APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. . . . THIS OFFERING HAS NOT BEEN APPROVED OR DISAPPROVED UNDER APPLICABLE STATE SECURITIES LAWS.'" (*Id.* ¶ 14.) "The fact that the Funds' securities had not been registered with the SEC was reiterated in the Prospective Purchaser Questionnaire which stated that 'the offering of the Securities has not been and will not be registered under the Securities Act of 1933, as amended, or state securities laws[] . . . .'" (*Id.* ¶ 15.)

"EquiAlt, with Wassgren's assistance, filed Forms D, entitled 'Notice of Exempt Offering of Securities,' with the SEC for each Fund." (*Id.* ¶ 17.) "The Form Ds certified that, 'if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).'" (*Id.*)

"Fund I filed a Form D on July 19, 2011, signed by Davison as Fund I's CEO, claiming an exemption from registration under Rule 506 for a $50 million offering of debt and tenant-in-common type securities." (*Id.* ¶ 19; *see also id.* ¶ 18.) "This Form D[] listed 0 non-accredited investors at the time of filing." (*Id.* ¶ 19.) "Fund I filed an amended Form D on June 28, 2013, which modified the type of securities offered to reflect only debt-type securities[;] stated that the first sale of securities had occurred on January 11, 2011[;] and indicated that the offering had been sold to 31 non-accredited investors out of a total of 60 investors at the time of filing." (*Id.*) "Fund I filed an amended Form D on August 13, 2019, which specified Rule 506(b) as the relevant exemption from registration . . . and indicated that the offering had been sold to 31 non-accredited investors out of a total of 1,089 investors at the time of filing." (*Id.*)

/ / /

"Fund II filed a Form D on April 4, 2016, signed by Davison as Fund II's CEO, claiming an exemption from registration under Rule 506(b) for a $20 million offering of debt-type securities." (*Id.* ¶ 20; *see also id.* ¶ 18.)  "This Form D stated that the first sale of securities had taken place on May 2, 2013, and indicated that the offering had been sold to 10 non-accredited investors out of a total of 88 investors at the time of filing." (*Id.* ¶ 20.) "The Form D indicated that solicitations pursuant to the offering and sales compensation would occur in Arizona, California, Colorado, Massachusetts, Nevada[,] and Utah." (*Id.*) "Fund II filed an amended Form D on April 28, 2016, which de-selected any specific states for sales compensation." (*Id.*)  "Fund II filed an amended Form D on September 1, 2017, which indicated that the offering had been sold to 10 non-accredited investors out of a total of 209 investors at the time of filing." (*Id.*)

"EA SIP Fund filed a Form D with the SEC on August 8, 2016,[2] signed by Davison as EA SIP Fund's CEO, claiming an exemption from registration under Rule 506(b) for a $25 million offering of debt-type securities." (*Id.* ¶ 22; *see also id.* ¶ 18.)  "This Form D listed 0 non-accredited investors at the time of filing." (*Id.* ¶ 22.)  "EA SIP Fund did not file additional Forms D." (*Id.*)

## B.    Recruitment of Defendants

Defendant JFI is a California corporation located in San Diego, California, that is owned and controlled by Defendant Robert Joseph Armijo. (*See* Jt. Stmt. ¶ 2.)  At all relevant times, neither Defendant was associated with a registered broker-dealer or registered as broker-dealer with the SEC, the Financial Industry Regulatory Authority ("FINRA"), or any state securities regulatory authority. (*See id.* ¶ 1.)

/ / /

/ / /

---

[2] Paragraph 18 of the Parties' Joint Statement indicates that the Form D for the EA SIP Fund was filed on August 8, 2016, while paragraph 22 indicates that it was filed on August 8, 2018.  A review of the Form D filed with the SEC establishes that it was filed in 2016.  *See* EA SIP LLC, Notice of Exempt Offering of Securities (Form D) (Aug. 8, 2016), *available at* https://www.sec.gov/Archives/edgar/data/0001680954/000168095416000001/xslFormDX01/primary_doc.xml.

21-CV-1107 TWR (RBB)

"Barry Rybicki . . . was EquiAlt's Managing Director and supervised the agents who marketed the Funds to prospective purchasers." (*Id.* ¶ 23.) "Rybicki operated a company called BR Support Services, LLC ("BR Support")." (*Id.*)

"On or about January 19, 2016, Rybicki recruited Defendants to solicit investors to make offers to buy Fund debentures." (*Id.* ¶ 24.) "Armijo spoke to Rybicki during a lengthy telephone conversation, lasting more than an hour." (*Id.*) "During that conversation, Armijo specifically asked Rybicki what licenses he would need to participate as an offering agent for the Funds." (*Id.*)

"Rybicki . . . represented to Defendants that, for compensation, Defendants would do the following, which they did do:" (1) "[c]ommunicate with, solicit, and encourage potential investors to prepare, sign, and submit offers to purchase a Funds' debenture or security[;]" (2) "[d]iscuss the backgrounds of the principal(s) associated with the Fund Managers with potential investors[;]" (3) "[i]nform investors about the possible merits and economic, market, and business risks related to the Funds' stated operations and operational model[;]" (4) "[l]isten to potential investors' representations about their investment objectives, net worth, portfolio, income needs, risk tolerance, and time horizon[;]" (5) "[p]rovide potential investors with the Funds' prepared marketing materials and offering materials, including the PPM and PPQ[;]" and (6) "[a]ssist potential investors complete and submit the Offer-to-Buy materials, including the PPQ, in order to purchase a Fund's securities." (*See id.* ¶ 27.) "Rybicki also represented to Defendants that compensation for agent services:" (1) "[w]ould be paid if the Fund accepted the solicited, potential investor's offer to buy the Funds' securities and the investor paid for such securities;" (2) "[c]ompensation would be paid from a Fund Manager marketing account and not from an investor's securities purchase money;" (3) "[a]ny compensation paid to Defendants would be paid through Rybicki's company, BR Support[;]" and (4) "[i]n an amount equal to 10% of the purchase amounts attributable to the investors whose offers Defendants had solicited." (*Id.* ¶ 41.)

/ / /

Rybicki made several additional representations to Defendants, including (1) "EquiAlt, as Fund Manager, had retained Wassgren as legal counsel for the Funds;" (2) "Wassgren had prepared materials, including the PPMs and PPQs, to be presented to potential investors; and" (3) "EquiAlt would pay Wassgren for legal advice Defendants solicited relative to the Fund Offerings, including the propriety of offering Fund Securities with the licenses held by Armijo—a Series 65 investment adviser license, but not a Series 7 broker license." (*Id.* ¶ 25.) As a result, "Defendants did not obtain independent advice on whether it was legal for them to be involved in the sale of EquiAlt debentures without any additional license." (*See id.* ¶ 26.) "Rybicki confirmed that Wassgren was 'our lawyer' for Armijo to talk to about all things EquiAlt and compliance." (*Id.*)

"On or about July 5, 2017, Rybicki provided Armijo with Wassgren's contact information so that Armijo could contact him." (*Id.* ¶ 29.) "On or about the same day, Armijo had a telephone conversation with Wassgren and Defendants relied on Wassgren's advice." (*Id.*) "On November 21, 2017, Armijo raised with Rybicki in a text message the question of whether he needed a Series 7 license to become involved in soliciting offers of an EquiAlt REIT, which was then being introduced by EquiAlt." (*Id.* ¶ 28.) "Rybicki responded in a November 21, 2017 text message, that Armijo did not need a Series 7 license: 'Series 65 is good to go!'" (*Id.*) "Rybicki made the same representation to Armijo on March 7, 2019." (*Id.*) "On or about May 14, 2019, Armijo again spoke by telephone with Wassgren, with Rybicki's permission, and Armijo again relied on Wassgren's advice." (*Id.* ¶ 30.)

### C. Defendants' Sales of the EquiAlt Funds

"Beginning in 2016 and continuing until February 2020, Defendants offered the EquiAlt Funds investments to more than 50 investors in California and other states." (Jt. Stmt. ¶ 33.) "Defendants admit that they participated in the sale of unregistered EquiAlt securities." (*Id.* ¶ 45.)

"Rybicki, on behalf of the Fund Manager, provided Defendants with all documents needed for a potential investor to submit an 'offer-to-buy' a Fund's securities ("Offering

Materials").”  (*Id.* ¶ 37.)  “The Funds’ Offering Materials included the PPM and PPQ, which Defendants received from the Funds.”  (*Id.* ¶ 38.)  “Defendants had potential investors complete and sign the PPQ that defined ‘accredited investor’ and instructed them to identify whether they were ‘accredited’ or ‘unaccredited’ under such definition.”  (*Id.* ¶ 39.)  “Defendants did not perform a background check or review the truthfulness of potential investors’ assertions that they were ‘accredited’ under the PPQ’s definition.”  (*Id.* ¶ 40.)  “Defendants were not provided with audited balance sheets or financial statements of EquiAlt,” (*see* ¶ 31), and “Armijo did not provide any audited balance sheets or financial statements of EquiAlt to the investors in the EquiAlt Funds.”  (*Id.* ¶ 32.)  “Although the Offering Materials had standardized terms, Defendants on one or more occasions requested that the Fund offer a higher-than-standard interest rate.”  (*Id.* ¶ 35.)

“EquiAlt paid Joseph Financial transaction-based compensation ranging from 6–12% of the amount invested in the EquiAlt Funds by investors solicited by Defendants.”  (*Id.* ¶ 42.)  “In the time period between [February 5, 2016,] and [June 26, 2017], Defendants sold approximately $6,082,937 of the EquiAlt Funds to their clients and received about $679,697 in Commission from these sales.”  (*Id.* ¶ 44.)  “From 2016 to 2020, Defendants solicited their clients to invest more than $10 million in the EquiAlt Funds.”  (*Id.* ¶ 34.)  “In total, Defendants earned at least $1,086,825 in transaction-based compensation as the agreed upon percentage of the total amount of offers-to-buy Fund securities that Defendants assisted potential investors to submit and that the Funds accepted, resulting in contracts of sale and subsequent sales of Fund securities.”  (*Id.* ¶ 43.)

“Defendants had no authority to do any of the following and did not do any of the following:” (1) “[a]ccept an offer to buy a Funds securities on behalf of the Fund Manager or the Fund;” (2) “[e]nter into any contract of sale or other contract with a potential investor;” (3) “[d]eposit a potential investor’s proffered payment to purchase a Fund’s security;” or (4) “issue a Fund’s security or title or transfer title to any such security.”  (*Id.* ¶ 36.)

/ / /

### D.    The SEC's Investigation and Ensuing Litigation

"The SEC investigated EquiAlt and the Funds and, on February 11, 2020, it filed a complaint against Davison and Rybicki ("Insiders") and the Funds in the U.S. District Court for the Middle District of Florida ("2020 Fraud Complaint")."[3] (Jt. Stmt. ¶ 46.) "The 2020 Fraud Complaint alleged violations of the anti-fraud provisions and certain registration provisions of the federal securities laws." (*Id.*) "The Complaint describes the Insiders' misappropriation or misuse of some portion of sales proceeds obtained in the Funds' Offerings and revenues generated from the Funds' real estate operations ("Misappropriations"), which it characterized as a 'massive Ponzi scheme' and alleged that no exemption from registration of the Funds' securities existed ("Exemption Disqualifications")." (*Id.*) "The Fund Manager and the Funds used a portion of sales proceeds obtained in the Funds' Offerings and revenues generated from the Funds' real estate operations to purchase, maintain, administer and dispose of real estate assets and to compensate its agents." (*Id.* ¶ 47.)

"Upon the SEC's filing of the 2020 Fraud Complaint, the public learned of the alleged Misappropriations and Exemption Disqualifications." (*Id.* ¶ 48.) "Defendants learned of the alleged Misappropriations and Exemption Disqualifications upon Plaintiff's filing of its 2020 Fraud Complaint." (*Id.* ¶ 49.)

/ / /

/ / /

---

[3] The Court additionally takes judicial notice of the following facts:  The 2020 Fraud Complaint was filed in *SEC v. Davison, et al.*, No. 8:20-cv-325-T-35AEP (M.D. Fla. filed Feb. 11, 2020) (the "2020 Fraud Action").  The district court appointed Burton W. Wiand as receiver on February 14, 2020.  *See* 2020 Fraud Action, ECF No. 11.  The receiver filed a "clawback" action, *Wiand v. Family Tree Estate Planning, LLC, et al.*, No. 8:21-cv-361-SDM-AAS (M.D. Fla. filed Feb. 13, 2021) (the "2021 Receiver Action"), seeking to recover from, among others, Defendants, monies transferred by the Insiders as commissions or other fees pursuant to Florida's Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. § 726, or, alternatively, unjust enrichment.  *See* 2021 Receiver Action, ECF No. 1; *see also id.* ¶¶ 22–23; (ECF No. 26-17 ("Wright Decl. Ex. I") (2021 Receiver Action first amended complaint).  The receiver filed for summary judgment against Defendants in the 2021 Receiver Action on August 3, 2022.  *See* 2021 Receiver Action, ECF No. 142.  As of the date of this Order, that motion is still pending before the Honorable Steven D. Merryday.

## II.   Relevant Procedural History

The SEC filed a Complaint for Injunctive and Other Relief and Demand for Jury Trial against Defendants on June 14, 2021, alleging violations of (1) Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c); and (2) Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(a)(1).  (*See generally* ECF No. 1 ("Compl.").)  Defendants answered on September 3, 2021.  (*See generally* ECF No. 7.)  After completing discovery, (*see* ECF No. 23), the Parties filed the instant Motions on October 19, 2022.  (*See generally* ECF Nos. 24, 26.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Although materiality is determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.*  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'"

/ / /

21-CV-1107 TWR (RBB)

1  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)

2  (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

3  Once the moving party satisfies this initial burden, the nonmoving party must

4  identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S.

5  at 324. This requires "more than simply show[ing] that there is some metaphysical doubt

6  as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

7  586 (1986). Rather, to survive summary judgment, the nonmoving party must "go beyond

8  the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories,

9  and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder

10  to return a verdict for the nonmoving party. *Celotex*, 477 U.S. at 324; *see also Anderson*,

11  477 U.S. at 248. Accordingly, the nonmoving party cannot oppose a properly supported

12  summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading."

13  *Anderson*, 477 U.S. at 256.

14  Where, as here, the Parties have filed cross-motions, the court considers the motions

15  "separately, giving the nonmoving party in each instance the benefit of all reasonable

16  inferences." *See SEC v. Feng*, 935 F.3d 721, 728 (9th Cir. 2019).

## ANALYSIS

17

18  Through the instant Motions, Plaintiff and Defendants each seek summary

19  adjudication in their favor as to both of Plaintiff's claims. (*See* Pl.'s MSJ at 1–2; Defs.'

20  MSJ at 1–2; *see also* ECF No. 24-1 ("Pl.'s Mem.") at 13; ECF No. 26-1 ("Defs.' Mem.")

21  at 1.) Alternatively, Defendants seek denial of Plaintiff's entitlement to injunctive relief,

22  disgorgement, and civil penalties as a matter of law, (*see* Defs.' Mem. at 1), or a stay or

23  dismissal of this action under the first-to-file rule. (*See id.*)

24  **I.  Sections 5(a) and (c) of the Securities Act**

25  Plaintiff alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act,

26  (*see* Compl. ¶¶ 25–27), which "make it unlawful to offer or sell a security in interstate

27  commerce if a registration statement has not been filed as to that security, unless the

28  / / /

transaction qualifies for an exemption from registration."[4]  *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013) (quoting *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010)).  "To establish a prima facie case for violation of Section 5, the SEC must show that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce."  *Id.* (citing *SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007); *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004) (per curiam)).  "Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption."  *Id.* (quoting *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980)).

Although it is undisputed that the EquiAlt Funds were not registered with the SEC during the relevant period, (*see, e.g.*, Jt. Stmt. ¶¶ 16, 45), Defendants contend that the EquiAlt Funds were exempt from registration under Rule 506(b) of Regulation D, 17 C.F.R. § 230.506(b), (*see* Defs.' Mem. at 7–8; Defs.' Opp'n at 5–9), and that "[t]he

---

[4] Specifically, in relevant part, Section 5 provides:

(a)   Sale . . . of Unregistered Securities

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1)   to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise[.]

. . .

(c)   Necessity of Filing Registration Statement

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . .

15 U.S.C. §§ 77e(a)(1), (c).

litigation algorithm of a Section 5 claim [*i.e.,*] the set of judicial rules created to prosecute or defend a Section 5 Claim," (*see* Defs.' Mem. at 12–13), violates the Due Process Clause, (*see id.* at 12–20), and Equal Protection.[5]  (*See id.* at 20.)

## A.    Regulation D

Defendants contend that the EquiAlt Funds were exempt from registration under Rule 506(b) of Regulation D.  (*See* Defs.' Mem. at 7–8; Defs.' Opp'n at 5–9.)  "Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), exempts from registration 'transactions by an issuer not involving any public offering.'" *Platforms Wireless*, 617 F.3d at 1090. "SEC-promulgated Regulation D creates a safe harbor within this exemption by defining certain transactions as non-public offerings." *Id.* at 1091 (citing *McGonigle v. Combs*, 968 F.2d 810, 825 n.19 (9th Cir. 1992); Revision of Certain Exemptions, Securities Act Release No. 6389, 24 S.E.C. Docket 1166 (March 8, 1982)). "Under Rule 506(b), securities are exempt from registration if they are private offerings." *SEC v. Schooler*, 905 F.3d 1107, 1114 n.3

---

[5] Defendants also originally contended that they were not "sellers" under the Securities Act, (*see* Defs.' Mem. at 11–12 & n.16; ECF No. 34 ("Defs.' Opp'n") at 3–5), but defense counsel conceded at oral argument that Defendants were sellers within the ambit of Section 5. In any event, Plaintiff has established as a matter of law that Defendants were "sellers" of securities within the meaning of the Securities Act. This is because "liability under Section 5 is not limited to the person or entity who ultimately passes title to the security." *See CMKM Diamonds*, 729 F.3d at 1255 (citing *Murphy*, 626 F.2d at 649). "Instead, courts have established the concept of 'participant' liability to bring within the confines of § 5 persons other than sellers who are responsible for the distribution of unregistered securities." *Id.* (quoting *Murphy*, 626 F.2d at 649). "With respect to Section 5, a defendant's 'role in the transaction must be a significant one before liability will attach.'" *Id.* (quoting *Murphy*, 626 F.2d at 648). "Defendants play a significant role when they are both a necessary participant and substantial factor in the sales transaction." *Id.* (internal quotation marks omitted) (quoting *Phan*, 500 F.3d at 906). As the Supreme Court has long recognized, "[t]he solicitation of a buyer is perhaps the most critical stage of the selling transaction." *See Pinter*, 486 U.S. at 646. Here, it is undisputed that Defendants "[c]ommunicate[d] with, solicit[ed], and encourage[d] potential investors to prepare, sign, and submit offers to purchase a Funds' debenture or security." (*See* Jt. Stmt. ¶ 27(A).) Had Defendants not conceded the issue, summary judgment in favor of Plaintiff would nonetheless be proper. *See, e.g.*, *Schaffer Fam. Invs. LLC v. Sonnier*, No. 2:13-CV-05814-SVWJEM, 2016 WL 6917269, at *9 (C.D. Cal. July 5, 2016) (granting summary judgment in favor of the plaintiffs on Section 5 claim where the defendant induced them to make purchases of securities from a third party); *SEC v. Thomas*, No. 2:19-CV-01515-APGVCF, 2021 WL 5826279, at *6 (D. Nev. Aug. 24, 2021), *appeal dismissed sub nom. SEC v. Ostertag*, No. 21-17014, 2022 WL 1792574 (9th Cir. Mar. 21, 2022) (granting summary judgment in favor of SEC where the defendants "carried out various sales activities on behalf of the entities they signed on with," including "communicat[ing] marketing materials to investors" in exchange for commissions).

(9th Cir. 2018) (citing 15 U.S.C. § 77d(2)). "A security qualifies as a private offering if there are fewer than 35 non-accredited investors of securities in the offering, and each non-accredited investor has 'such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.'"[6] *Id.* (quoting 17 C.F.R. § 230.506(b)(2)). "If the issuer sells securities under § 230.506(b) to any purchaser that is not an accredited investor, the issuer shall furnish . . . [f]inancial statement information."[7] *See* 17 C.F.R. §§ 230.502(b)(1), (2)(i)(B).

Here, EquiAlt sold Fund I securities to 31 non-accredited investors, (*see* Jt. Stmt. ¶ 19), and Fund II securities to ten. (*See id.* ¶ 20.) Indeed, Defendants personally sold securities to non-accredited investors.[8] (*See, e.g.*, ECF No. 24-9 ("Kadell Decl.") ¶¶ 3–4; ECF No. 24-10 ("Tarillion Decl.") ¶¶ 4–5; ECF No. 24-11 ("Murphy Decl.") ¶¶ 4–8.) Although these non-accredited investors were required to receive financial statement information, *see* 17 C.F.R. §§ 230.502(b)(1), (2)(i)(B), EquiAlt's PPMs did not include

---

[6] For purposes of Regulation D, "[a]ccredited investor shall mean . . . [a]ny natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000," excluding that person's primary residence, or "who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year." 17 C.F.R. §§ 230.501(a)(5), (6).

[7] Defendants contend that Rule 506 requires only the issuer—here, EquiAlt—to establish that it qualifies for exemption from the registration requirement. Not only do Defendants fail to cite any authority supporting their position, but the SEC has made clear that non-issuers "who claim[] an exemption from registration, similar to that of the issuer, ha[ve] the burden of proving the exemption applies." *See In re Glaza*, SEC Release No. 293 (July 21, 2005) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).

[8] Defendants contended at oral argument that there exist disputed factual issues, such as whether unaccredited investors falsely represented to Defendants that they were accredited. Not only have Defendants made judicial admissions to the contrary, (*see* ECF No. 24-13 ("Ex. 11") (Defendants Joseph Financial, Inc., Joseph Financial Investment Advisors, LLC, and Robert Joseph Armijo's Answer to the Complaint and Demand for Jury Trial ¶ 28, *O'Neal v. Joseph Financial, Inc.*, No. 8:22-cv-939-MSS-JSS (M.D. Fla. filed July 6, 2022), ECF No. 31 ("Defendant Armijo admits that he knew that some investors with whom he was involved in the sale of EquiAlt securities were unaccredited.")), but it is unclear to the Court how such facts are material. *See, e.g.*, *SEC v. Loomis*, 969 F. Supp. 2d 1226, 1240 (E.D. Cal. 2013) (granting summary judgment in favor of the SEC where the defendant "provided no probative evidence to support the contention that he reasonably believed that . . . investors were accredited, an essential element for establishing the applicability of Rule 506").

21-CV-1107 TWR (RBB)

financial statements, (*see* Jt. Stmt. ¶ 13), and Defendants never provided audited balance sheets of financial statements to investors in the EquiAlt Funds. (*See id.* ¶ 32.) In short, Defendants produce no evidence that non-accredited investors were ever provided with audited or certified financial statements as required under Regulation D.

Defendants also argue that their noncompliance with Rule 506(b) is "insignificant" under Rule 508(a),[9] (*see* Defs.' Opp'n at 5–9; ECF No. 40 ("Defs.' Reply") at 6–10), which provides, in relevant part:

> A failure to comply with a term, condition or requirement of . . . [Rule 506] will not result in the loss of the exemption . . . , if the person relying on the exemption shows:
>
> (1)    The failure to comply did not pertain to a term, condition or requirement directly intended to protect that particular individual or entity; and
>
> (2)    The failure to comply was insignificant with respect to the offering as a whole, provided that any failure to comply with paragraph (c) of § 230.502, paragraph (b)(2) of § 230.504 and paragraph (b)(2)(i) of § 230.506 shall be deemed to be significant to the offering as a whole; and
>
> (3)    A good faith and reasonable attempt was made to comply with all applicable terms, conditions and requirements of . . . [Rule 506].

17 C.F.R. § 230.508(a). Rule 508(a), however, is facially unavailable to Defendants here. Not only is Rule 508(a) not available where, as here, it is the SEC who is bringing this action under Section 20 of the Securities Act, *see* 17 C.F.R. § 230.508(b) ("Where an

---

[9] To the extent Defendants contend that Plaintiff's evidence is inadequate, (*see* Defs.' Mem. at 8 ("The claim that unaccredited investors of the Fund Offerings received no financial statements . . . fails to identify the specific investors, number of total unaccredited investors, Fund security(ies) purchased, timing of the purchase(s), or offering agent(s) who were involved.")), it is *Defendants* who bear "the burden of proof in showing entitlement to an exemption." *See SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) ("*Murphy I*") (collecting cases); *see also, e.g.*, *SEC v. Schooler*, No. 3:12-CV-2164-GPC-JMA, 2015 WL 2344866, at *1 (S.D. Cal. May 14, 2015) (*sua sponte* amending prior summary judgment order on the grounds that the SEC was not required to negate the defendants' affirmative defense to a registration violation (citing *Celotex*, 477 U.S. at 323)), *aff'd in relevant part by Schooler*, 905 F.3d 1007.

exemption is established only through reliance upon paragraph (a) of this section, the failure to comply shall nonetheless be actionable by the Commission under section 20 of the Act."); (*see also* Compl. ¶ 6), but Rule 508(a)(2) does not encompass the failure to provide the requisite disclosures to non-accredited investors pursuant to Rule 502(b). Instead, Rule 508(a)(2) is expressly limited to failures to comply with "paragraph (c) of § 230.502, paragraph (b)(2) of § 230.504 and paragraph (b)(2)(i) of § 230.506."[10] *See* 17 C.F.R. § 230.508(a)(2). Accordingly, the Court concludes that Defendants have failed to carry their burden of establishing that there exist genuine issues of material fact regarding their claimed exemption from registration under Regulation D.

## C. Constitutional Challenges

Finally, Defendants contend that the "litigation algorithm" of a Section 5 claim—which "includes a set of inflexible rules, including: (1) the SEC's *prima facie* rule; (2) the automatic-violation rule; (3) the burden-shifting rule; (4) the narrow-construction-of-exemption rule; and (5) the all-or-nothing exemption-qualification rule," (*see* Defs.' Mem. at 13), violates the Due Process Clause, (*see id.* at 12–20), and Equal Protection. (*See id.* at 20.)

### 1. Due Process Clause

According to Defendants, "[t]he Due Process Clause's fair notice requirement generally requires only that the government make the requirements of the law public 'and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" (*See* Defs.' Mem. at 12 (quoting *Fed. Express Corp. v. Dep't of Commerce*, 39 F.4th 756, 773 (D.C. Cir. 2022))). "The terms of a law may be sufficiently familiar, but notice is irrelevant if one's 'compliance' is simply a function, not of one's otherwise lawful

---

[10] Only paragraph (c) of § 230.502, which addresses the "offer or s[ale of] the securities by any form of general solicitation or general advertising," *see* 17 C.F.R. § 230.502(c), and paragraph (b)(2)(i) of § 230.506, which provides the 35-unaccredited-purchaser-per-90-calendar-days limit, *see* 17 C.F.R. § 230.506(b)(2)(i), are relevant to Defendants' Rule 506 defense. Paragraph (b)(2) of § 230.504 is relevant to sales of securities whose aggregate offering price does not exceed $10,000,000, *see* 17 C.F.R. § 230.504(b)(2), which Defendants do not invoke here.

conduct, but of a separate party's independent action that renders otherwise lawful conduct unlawful, particularly when those actions are completely outside of the defendant's knowledge and control, as in this case." (*Id.*)

"The degree of vagueness the Due Process Clause will tolerate 'depends in part on the nature of the enactment.'" *Kashem v. Barr*, 941 F.3d 358, 370 (9th Cir. 2019) (quoting *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)). "Relevant factors include whether the challenged provision involves only economic regulation, imposes civil rather than criminal penalties, contains a scienter requirement and threatens constitutionally protected rights." *Id.* (citing *Hoffman Ests.*, 455 U.S. at 498–99; *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995)). "Where economic regulation is involved, vagueness is less of a concern because 'the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.'" *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 571 (9th Cir. 2018) (quoting *United States v. Doremus*, 888 F.2d 630, 634–35 (9th Cir. 1989) (quoting *Hoffman Ests.*, 455 U.S. at 498)). "The [Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman Ests.*, 455 U.S. at 498–99.

"Whether a provision is vague for lack of fair notice is an objective inquiry." *Kashem*, 941 F.3d at 371 (citing *United States v. Williams*, 553 U.S. 285, 304–05 (2008); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). In evaluating vagueness, the court "ask[s] whether the law gives 'a person of ordinary intelligence fair notice of what is prohibited[.]'" *See id.* (quoting *Williams*, 553 U.S. at 304). In an as-applied challenge, such as here, (*see, e.g.*, Defs.' Mem. at 19–20), "the question for the court to determine . . . is whether defendant had notice that his or her particular conduct could be a violation of the statute." *Oracle USA, Inc. v. Rimini St., Inc.*, 191 F. Supp. 3d 1134, 1148 (D. Nev. 2016) (citing *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012)).

/ / /

As Plaintiff notes, (*see* Pl.'s Opp'n at 9), the undisputed facts reveal that Defendants had such notice here.  Indeed, Defendants explicitly discussed with Rybicki and Wassgren the registration requirements and Regulation D.  (*See, e.g.*, ECF No. 26-2 ("Armijo Decl.") ¶ 19 ("It was my understanding that Wassgren . . . prepared and filed all paperwork necessary for Regulation D exemption[.]"); *id.* ¶ 23 ("I was . . . vigilant in my compliance with the Regulation D requirement that there be no more than 35 unaccredited investors."); *id.* ¶ 24 (2018 call with Rybicki regarding unaccredited investor limit).)  Rather than obtain independent counsel, (*see* Jt. Stmt. ¶ 26; Armijo Decl. ¶ 12), or seek guidance from the SEC, *see, e.g.*, 17 C.F.R. § 200.81, Defendants accepted—and profited from—Rybicki's and Wassgren's self-serving representations of compliance.  As Plaintiff notes, (*see* Pl.'s Opp'n at 9 (citing *Murphy I*, 626 F.2d at 649)), "[b]oth the language of Section 5, and its application to non-issuers who are necessary participants in the sale of securities, are clear and unambiguous, and have been well-established securities law for more than 30 years."  Accordingly, the Court concludes that Section 5, as applied to Defendants, does not violate the Due Process Clause.

### 2.    *Equal Protection*

Defendants contend that the Section 5 claim litigation algorithm also violates Equal Protection because, "[i]f the SEC is granted the relief it seeks, it will receive the same relief as it would if it had been required to prove a scienter-based antifraud violation."  (*See* Defs.' Mem. at 20.)  According to Defendants, "[i]mposing the same consequences for two claims, one in which Defendants are absolutely liable and another for which the SEC would have the difficult evidentiary burden of proving scienter, lacks any rational basis and violates equal protection."  (*See id.*)

The Court assumes that Defendants are invoking the Fifth Amendment.  (*See* Defs.' Mem. at 20; *see also* Pl.'s Opp'n at 10 (noting that Defendants' invocation of equal protection is "(presumably of the U.S. Constitution)".)  "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 (1975)

(alteration in original) (quoting *Schneider v. Rusk*, 377 U.S. 163, 168 (1964); citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).   Accordingly, the Supreme "Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *See id.* (citing *Schlesinger v. Ballard*, 419 U.S. 498 (1975); *Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974); *Frontiero v. Richardson*, 411 U.S. 677 (1973)).   "Generally, legislation is presumed to pass constitutional muster and will be sustained if the classification drawn by the statute or ordinance is rationally related to a legitimate state interest." *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–40 (1985)).   "If the classification disadvantages a 'suspect class' or impinges a 'fundamental right,' the ordinance is subject to strict scrutiny." *Id.* (citing *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982)).

Here, Defendants do not object to being treated differently than a similarly situated class, but rather appear to object to being treated similarly to what they see as a differently situated class—those who commit fraudulent securities violations.   This is the inverse of an Equal Protection claim.   In any event, as Plaintiff notes, (*see* Pl.'s Opp'n at 11), Defendants would not be subject to the "same consequences" for their strict-liability offenses as those who commit scienter-based violations.   *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B) (outlining "tiers" of increasing penalties based on whether the offense "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons").   Finally, even if Defendants were being treated differently than those who truly are similarly situated, Defendants have failed "to negative every conceivable basis which might support it." *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). The Court therefore concludes that Defendants have failed to establish that the litigation algorithm for Section 5 claims violates Equal Protection.

/ / /

### D.    Conclusion

For the above reasons, the Court **GRANTS** Plaintiff's Motion and **DENIES** Defendants' Motion as to Plaintiff's first cause of action for the sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act.

## II.    Section 15(a)(1) of the Exchange Act

Plaintiff also alleges that Defendants violated Section 15(a)(1) of the Exchange Act because they induced securities transactions without being registered as brokers with the SEC.[11]  (*See* Compl. ¶¶ 29–30.)  Although it is undisputed that Defendants were not registered as brokers during the relevant time, (*see* Jt. Stmt. ¶ 1), Defendants contend that they are not "engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(4)(A); (*see also* Defs.' Mem. at 20–22; Defs.' Opp'n at 9–12). Specifically, while Defendants do not contest that they are "engaged in the business," Defendants contend that they did not "effect[] transactions in securities" because they were merely "go-betweens," (*see* Defs.' Opp'n at 10–11), and that they did not do so "for the account of others" because they "had no access to or control over any purchaser or issuer accounts."  (*See id.* at 11–12.)  Defendants also challenge the applicability of the Exchange Act to their conduct because, "[g]enerally, the Securities Act concerns primary markets and the Exchange Act secondary markets," and "[t]his action is about the EquiAlt Funds' offerings in a primary market."  (*See* Defs.' Mem. at 21.)

Courts have addressed—and foreclosed—the very arguments that Defendants raise here.  First, regarding Defendants' argument that the Exchange Act—and, consequently, the broker registration requirement—applies only to transactions on the "secondary

---

[11] In relevant part, Section 15(a)(1) provides:

> It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1)

markets," (*see id.* at 21), the Ninth Circuit rejected that argument in *Feng. See* 935 F.3d at 733.  In *Feng*, the Ninth Circuit affirmed the district court's grant of summary judgment in favor of the SEC on its Section 15(a)(1) claim against an immigration attorney who solicited investments in certain pooled investments, known as "regional centers," regulated by the U.S. Citizenship and Immigration Services under the U.S. Immigrant Investor Program, or "EB-5 program," which provides legal permanent residency to foreign nationals who invest in U.S.-based projects. *See id.* at 725–28.  In short, the immigration attorney argued that he was only "involve[d in] negotiations between issuers and investors," *see id.* at 732, while the broker registration "requirement should apply only to individuals who trade securities on an exchange and not to those involved in transactions between private parties." *See id.* at 733.  Relying on *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976),[12] the Ninth Circuit concluded that the Exchange Act was intended to protect private party investors who purchased securities from private party issuers through an intermediary such as the attorney defendant. *See Feng*, 935 F.3d at 733.

Second, as for Defendants' argument that they had no control over others' accounts, (*see* Defs.' Opp'n at 11–12), the Ninth Circuit has noted that "the caselaw . . . does not impose such a requirement as a prerequisite for finding that someone is a broker." *See Feng*, 935 F.3d at 732 n.7 (citing *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1339–40 (M.D. Fla. 2011); *SEC v. M & A W., Inc.*, No. C-01-3376 VRW, 2005 WL 1514101, at *9 (N.D. Cal. June 20, 2005)).  Indeed, as the Ninth Circuit recently explained in *SEC v. Murphy*, 50 F.4th 832 (9th Cir. 2022) ("*Murphy II*"), "account" in this context has to do with risk; in other words, "if someone acts 'on the account of *others*,' another person assumes the risk for the actions." *See id.* at 843 (emphasis in original).  Such is the case here, where it

---

[12] Specifically, the Ninth Circuit reasoned that "[i]t is well established . . . that '[t]he 1934 [Exchange] Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges *and in over-the-counter markets*.'" *See Feng*, 935 F.3d at 733 (third and fourth alterations and emphasis in original) (quoting *Ernst & Ernst*, 425 U.S. at 195). Defendants argued for the first time at oral argument that they were not participants in over-the-counter markets. *Feng*, however, appears to be dispositive of the issue.

was the investors Defendants solicited, rather than Defendants themselves, who bore the risk of their investments in the EquiAlt Funds.

Finally, Defendants contend that they were mere "go-betweens" in transactions between the issuer and purchasers. (*See* Defs.' Opp'n at 10–11.) But that is precisely the role that brokers play: "They serve[] as salespeople and go-betweens for the buyers and sellers of securities." *See SEC v. Forester*, No. CV-209813-DMGAFMX, 2022 WL 1600046, at *2 (C.D. Cal. Feb. 23, 2022) (entering default judgment against defendants whose "served as . . . go-betweens[,] . . . earned commissions[,] . . . were not employees of the securities issuer, . . . [and] negotiated with buyers on behalf of sellers"); *see also Feng*, 935 F.3d at 733; *Broker*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/broker (defining broker as "one who acts as an intermediary" and, in the legal context, as "an agent who negotiates contracts of sale (as of real estate or securities) . . . between the parties for a fee or commission"). Accordingly, none of Defendants' arguments foreclose concluding that they were brokers as defined by the Securities Act.

"[I]n evaluating whether someone is a 'broker,' the SEC and courts . . . have generally employed a 'totality-of-the-circumstances approach,' relying on the non-exclusive *Hansen* factors" articulated in *SEC v. Hansen*, No. 83 CIV. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984)." *See Murphy II*, 50 F.4th at 843 (citing *Feng*, 935 F.3d at 731–32). Under the non-exclusive *Hansen* factors, the court examines whether the defendant:

> (1) is an employee of the issuer of the security; (2) received transaction-based income such as commissions rather than a salary; (3) sells or sold securities from other issuers; (4) was involved in negotiations between issuers and investors; (5) advertised for clients; (6) gave advice or made valuations regarding the investment; (7) was an active finder of investors; and (8) regularly participates in securities transactions.

*See id.* at 840–41 (quoting *Feng*, 935 F.3d at 732); *see also id.* at 843. Application of the *Hansen* factors is not required to establish liability, *see Murphy II*, 50 F.4th at 842–46 (holding that defendant was a broker based on "the statutory text" without "rely[ing] on the *Hansen* factors"), although "the presence of even a few is enough" to do so. *See SEC*

*v. River N. Equity LLC*, 415 F. Supp. 3d 853, 860 (N.D. Ill. 2019) (citing *SEC v. Benger*, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010)).  "The most important factor in determining whether an individual or entity is a broker is the regularity of participation in securities transactions at key points in the chain of distribution."  *SEC v. RMR Asset Mgmt. Co.*, No. 18-CV-1895-AJB-LL, 2020 WL 4747750 (S.D. Cal. Aug. 17, 2020) (internal quotation marks omitted) (quoting *SEC v. Holcom*, No. 12-cv-1623, 2015 WL 11233426, at *4 (S.D. Cal. Jan. 8, 2012)), *aff'd sub nom. Murphy II*, 50 F.4th 832 (9th Cir. 2022).

Defendants failed to address the *Hansen* factors in their briefing, (*see generally* Defs.' Mem.; Defs.' Opp'n; Defs.' Reply), but they conceded at oral argument that at least four of the factors favor concluding that they acted as brokers.  As Plaintiff notes, (*see* Pl.'s Mem. at 12–13; Pl.'s Opp'n at 12–13; Pl.'s Reply at 9–10), and Defendants conceded, Defendants received transaction-based commissions, negotiated higher interest rates on behalf of individual clients, gave advice regarding the merits of investment in the EquiAlt Funds, and were active finders of investors for EquiAlt.  Arguably, the eighth factor— regular participation in securities transactions—also weighs in favor of finding that Defendants were brokers, as Defendants solicited more than fifty clients to invest more than $10 million in the EquiAlt funds over a four-year period.  (*See* Jt. Stmt. ¶¶ 33–34.) Although Defendants did not sell securities from other issuers, (*see* ECF No. 24-8 ("Ex. 6") at 34:4–20), or advertise for clients, (*see id.* at 50:25–51:18), based on the totality of the circumstances, no reasonable jury could conclude that Defendants were not acting as brokers with regard to the sale of the EquiAlt Funds.  Accordingly, the Court **GRANTS** Plaintiff's Motion and **DENIES** Defendants' Motion as to Plaintiff's second cause of action for failure to register as brokers under Section 15(a)(1) of the Exchange Act.

## III.  Remedies

In the alternative, "[i]f one or both of Plaintiff's claims survive, Defendants submit that the relief the SEC seeks for such claims should be denied as a matter of law."  (*See* Defs.' Mem. at 22.)  Plaintiff responds that "no request for a specific disgorgement or civil penalty is currently before this Court," meaning "there is no reason for the Court to consider

at this stage the academic issue of what remedies are appropriate or which violations may be penalized." (*See* Pl.'s Opp'n at 13.)  The Court agrees with Plaintiff and therefore **DENIES WITHOUT PREJUDICE** Defendants' Motion to the extent it seeks summary adjudication of the availability of disgorgement, civil penalties, and injunctive relief. *See, e.g.*, *SEC v. Keener*, 580 F. Supp. 3d 1272, 1292 (S.D. Fla. 2022) ("Defendant's remaining challenges regarding Plaintiff's ability to obtain disgorgement or injunctive relief are denied as premature and shall be addressed at the remedies phase of the proceedings.").

## IV.   First-to-File Rule

Finally, Defendants contend that this case should be stayed or dismissed under the first-to-file rule pending adjudication of the 2021 Receiver Action.  (*See* Defs.' Mem. at 27–28.)  As Defendants note, (*see id.* at 28), "[t]he first-to-file rule is a generally recognized doctrine of federal comity that permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Walker v. Progressive Cas. Ins. Co.*, No. C03-656R, 2003 WL 21056704, at *2 (W.D. Wash. May 9, 2003) (citing *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir. 1982)).  "Exact parallelism between the two actions need not exist; it is enough if the parties and issues in the two actions are 'substantially similar.'" *Id.* (citing *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989)).

Plaintiff counters that "the first-to-file rule does not apply here" because "the two actions do not involve substantially [similar] parties or substantially similar claims." (*See* Pl.'s Opp'n at 14.)  Although Defendants are parties to both this action and the 2021 Receiver Action, (*compare* Compl., *with* Wright Decl. Ex. I), the actions are brought by different plaintiffs.  As Plaintiff notes, "[t]he SEC's action against Defendants arises out of the SEC's unique role as a securities regulator charged with enforcing the federal securities laws." (*See* Pl.'s Opp'n at 14; *see also generally* Compl.)  "In contrast, the Receiver's action is brought on behalf the private Receivership entities, (the EquiAlt Funds and the EquiAlt REIT), as part of his Court appointed powers to institute legal proceedings for the benefit of the Receivership." (*See* Pl.'s Opp'n at 14–15; *see also generally* Wright

Decl. Ex. I.)  The Court simply cannot conclude that the receiver stands in a substantially similar role to the SEC given the SEC sued the Receivership entities in the 2020 Fraud Action.  (*See* Pl.'s Opp'n at 15.)

Further, the issues presented in this case and the 2021 Receiver Action are not substantially similar.  The issues presented here pertain to whether Defendants violated the federal securities laws, (*see* Pl.'s Opp'n at 15; *see also generally* Compl.), whereas the 2021 Receiver Action asks whether the transfers of commissions to Defendants were unjust enrichment or were fraudulent such that they can be recovered by the receiver pursuant to Florida Statute section 726.  (*See* Pl.'s Opp'n at 15; *see also generally* Wright Decl. Ex. I.) "Because these issues are distinct, the requirement of identity of the issues is not met, and the first-to-file rule is inapplicable."  *See Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997).

Accordingly, the Court concludes that the first-to-file rule does not apply here and therefore **DENIES** Defendants' Motion to the extent it seeks stay or dismissal on that basis. In any event, as Plaintiff notes, (*see* Pl.'s Opp'n at 16), "whichever case proceeds to judgment first, that judgment would be applied as a setoff to the recovery in the second suit to judgment," negating Defendants' stated concern of "double recovery."  (*See* Defs.' Mem. at 28.)

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 24) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 26).  Specifically, the Court **GRANTS** summary judgment in favor of Plaintiff and against Defendants on both Plaintiff's causes of action, **DENIES WITHOUT PREJUDICE** Defendants' Motion to the extent it contends that Plaintiff is not entitled to

/ / /

/ / /

/ / /

/ / /

certain remedies as a matter of law, and **DENIES** Defendants' Motion to the extent it seeks a stay or dismissal of this action under the first-to-file rule.

  **IT IS SO ORDERED.**

Dated:  March 8, 2023

_____
Honorable Todd W. Robinson
United States District Judge

21-CV-1107 TWR (RBB)